### Hoge *against* Hoge.

Declarations of a testator, made contemporaneously with his will, are competent evidence to establish a trust in him to whom an absolute estate is devised, when followed by evidence that such devise was obtained by the fraudulent procurement of the devisee.

If a testator be induced to make a devise, by the promise of the devisee that it should be applied to the benefit of another, a trust is thereby created, which may be established by parol evidence; and this is not contrary to the statute of wills.

If a compromise of a doubtful right be obtained from a plaintiff through the misrepresentation of a witness, and in consequence of the influence of his testimony, and the persuasion of arbitrators, to whom the same had been referred: it is not binding, if the defendant knew of such misrepresentation, and availed himself unduly of its influence.

ERROR to the common pleas of *Washington* county.

This was an action of ejectment by *William Hoge* against *William Wilson* and *William Hoge*, son of *David Hoge*, brought to December term 1827, to recover the possession of an undivided equal third part of six hundred acres of land, adjoining the borough of Washington. Both parties claimed under *William Hoge*, and admitted that he died seised of an estate in fee simple in the land in dispute.

The plaintiff below, on the trial, in order to support his claim to the land, gave in evidence the last will and testament of *William Hoge*, the deceased, dated the 21st day of September 1814, and proved the 9th day of November 1814, by which he, *inter alia*, devised as follows, to wit : " I devise, will and direct, that my lands should be divided into three equal shares or portions, according to quantity and quality; one of which shares or portions I devise to the male heirs of my deceased brother, *Jonathan Hoge*, their heirs and assigns for ever ; the second share or portion I devise to the male heirs of my brother, *David Hoge*, their heirs and assigns for ever; and the remainder share or portion I devise to my brother, *John Hoge*, his heirs and assigns for ever ; also after the decease or marriage of my said well beloved wife, *Isabella Hoge*, I devise and bequeath to my aforesaid friend and nephew, *James Blaine*, all my quit rent estate, to be held during his natural life, and after his decease that it shall be divided and held in the same manner and designation of persons as my other landed estate."

The plaintiff below then offered to prove by *Thomas M'Giffin*, Esq. and others, that the devise to *John Hoge*, in the will just read, was made in trust for the said plaintiff, and for that purpose offered to

[Hoge v. Hoge.]

give in evidence the declarations of the testator, made at the time of writing the will, to Mr *M'Giffin*, the witness, who was the scrivener, and again by subsequent declarations of *John Hoge,* the devisee named in the will; to which the defendants' counsel below objected, whereupon the court overruled the objection and admitted the testimony, to which opinion of the court the defendants' counsel excepted, and prayed the court to sign and seal a bill of exceptions, which was accordingly done.

Subject to the above exception, the plaintiff below gave in evidence the following parol evidence—first by

*Thomas M'Giffin,* who, being sworn, testified, that some time before the will of *William Hoge* was written, not many days, the testator told witness that he wanted him to write his will, not to help him to make it—that he would do himself; that he had intended writing it himself, but had neglected it until now, when his disease made it inconvenient for him to write. Testator spoke of this matter a second time to the witness; and some few days afterwards, when witness had called again to see the testator, he told witness it was now time to finish that business of which he had been before speaking to him. Testator then repeated to the witness the disposition which he wished to have made of his estate, and witness committed it to writings as contained in the will—read it over to the testator, who said it was right. Whilst the witness was writing the will, the testator, in speaking of the devise to his brother *John,* observed to witness, (though witness cannot recollect the precise words used by testator, but in substance said) as regards the devise to his brother *John Hoge,* it was a trust, and that he had no other way of doing it; he must leave it entirely to his honour, that he had full confidence in him. Testator named no person for whom the trust was intended. After writing the will, witness read it over to the testator, who was lying on his bed, very deliberately, clause by clause, and when done, testator observed, " That's the yarn, only you have converted a horse into a filly." Testator again repeated that the devise to his brother *John* was a trust, and that he had no other way of doing it, that he must leave it to his honour, and in that he had entire confidence. No words were used at the time by the testator to indicate the person for whom the trust was intended. On the evening of the day of the funeral of the deceased, after it was over, witness thinks, but will not be sure that it was at that time, he met with *John Hoge,* the devisee, in the street of Washington, when a conversation took place about his brother *William's* making his will. Witness stated to *John Hoge* what disposition the testator had made of his estate, and the devise made to himself, that is *John Hoge,* and also what the testator said at the time of writing the will, in regard to it, to which *John Hoge* replied, " that is intended for young *William Hoge.*" *John Hoge* further said, that he had been a long time trying to get him to do it, but he had not the courage. *John Hoge* then went on to state the difficulties made by his brother, when he spoke to him on behalf

[Hoge v. Hoge.]

of young *William Hoge*, (meaning the plaintiff) and among other things, mentioned, that if it were given to him all at once it might do him more injury than good—that he could not in justice give him his personal estate, for that of right belonged to his wife, and as to his real estate, that he had got from his father, and wished it to continue in the family name. *John Hoge* also stated, that it was through him that the testator had been prevailed on to furnish or to pay for a horse, saddle and bridle, and some other things, as a military equipment for the plaintiff, then about going out on militia duty during the late war with England. That these things had been gotten, and finally he prevailed on the testator to pay for them. Witness had no subsequent conversation with *John Hoge* in relation to the trust, except what passed at the time of taking witness's deposition, which was intended to be read in evidence before arbitrators, to whom a former action of ejectment, brought by the plaintiff for the same property, had been referred. *John Hoge* then said that he considered that witness was in error as to his apprehension of some of the particulars referred to in the conversation first above had between them, and said witness must have confounded what passed at that time with other matters.

On the bringing of the former action, which was commenced against *Samuel Lyon*, witness stated that he received a few lines written by *John Hoge* to him, which lines were produced, and in which *John Hoge* states, that he had that day, to wit the 1st day of June 1820, been informed that the plaintiff had employed Messrs *M'Kennan* and *William Baird* to bring a suit against him for the land in dispute, and that he wished the witness and Mr *Campbell* to be counsel for him. In relation to the land, *John Hoge* stated to witness, that his brother *William* said it had come from his father, and he did not wish it to go out of the name or family of the male line, not certain which expression he used, but witness considered the one expression equivalent to the other. In the conversation with *John Hoge*, in reference to his brother's disposing of his property, witness understood him as alluding to a will; because in speaking of witness being appointed one of the executors of the will, *John Hoge* said that he had suggested that to his brother *William*. Witness understood *John Hoge* to have said, that when his brother spoke of the difficulties that occurred in making provision for the plaintiff, he (*John Hoge*) suggested to his brother to give it to him; but did not speak of a devise nor a will then; nor say in words that his brother had ever consented to do so. Witness has no recollection of *John Hoge's* telling him of any objections that the testator had in his lifetime to the plaintiff. Thinks the widow of the testator was married to Mr *Reed* in the fall of 1819. Some short time before her marriage with Mr *Reed*, witness asked Mr *John Hoge* if he would sell the property devised to him by his brother *William*, as he wished to purchase it. Mr *Hoge* answered he would. Witness found afterwards that he was unable to buy, and declined it. That the

trust was not mentioned or spoken of by either of them at any time when witness talked with Mr *Hoge* about buying the property.

*John Graham* sworn, and says: that on the evening after the funeral of *William Hoge*, *John Hoge* told him that his brother *William* had left his real estate to be divided into three equal parts, to *David*, *Jonathan* and himself. It is so long since, that witness cannot recollect distinctly: that one-third was left to him (*John Hoge*) in trust for young *William*. *John Hoge* said there were two points in which his brother had not done right; one was in cutting out the widow of her thirds when she married, and the other was something in respect to young *William;* but cannot say now what it was; whether it was that he had not left him enough, cannot say. *John Hoge* stated then that testator had not done as he ought to have done for young *William*.

*Jacob Henry* sworn, and says: that the last time he, witness, was over with *John Hoge* at his place above Georgetown, shortly after the death of *William Hoge*, witness went there to work for *John Hoge*. *John Hoge* took a copy of the will out of his pocket, and read it. He said it was not in the will, but he (*John Hoge*) was authorized to give it to young *William*; that he was not a lawful child. *John Hoge* talked about it several times, the same thing. He worked for *John Hoge* about his mill. Heard him say that one-third was given in the will to him, and he had it in his power to give it to young *William*. There was one time when *James Reed*, who is now dead, was present; nobody else present at any time. The plaintiff spoke to me long ago, about what I knew, in the lifetime of *John Hoge;* but witness told him he might as well do without him. Plaintiff spoke to witness again about it, and after thinking on it, recollected all as well as ever. Witness heard *John Hoge* tell Mr *Grimes* about it. *John Hoge* did not say to *Grimes* that there was any thing in which his brother *William* had done wrong in his will in regard to his widow; mentioned nothing of the kind. Never heard him speak of it to any other person.

The deposition of *Joseph Pentecost*, who says: he never had any conversation with *John Hoge*, but once, on the subject of his brother's will. Shortly after the death of his brother, deponent asked if deceased had made any provision for young *William?* Mr *Hoge's* reply was this: that *William* wished him to give part of his own estate then, that is at the time of his death; but he refused to do it, alleging that young *William* might as well wait to the marriage or death of Mrs *Hoge;* as she was young she would outlive him, and he wanted the use of his own property. On cross examination: Did *John Hoge* state any thing that was offered to him in lieu of the property to be given by him to young *William?* Answer, No. The question he (deponent) put to *John Hoge*, relative to the provision made for young *William*, was in consequence of *John Hoge's* writing to deponent to take young *William* into his tanyard, and in consequence of knowing that Mr *Hoge* had been sending young *William*

to school, and he drew the inference that *John Hoge* was to get property from *William Hoge's* estate.

*Andrew Swearingen's* deposition. Some time after the death of *William Hoge*, he fell in company with *John Hoge* at his own house, and knowing that *John Hoge* was always a great friend to young *William*, felt anxious to know what the deceased had done for him by will. Mr *John Hoge* told me that he had not left him any thing. Deponent expressed surprise, as he had not heard of any other child. Mr *Hoge* told him that his brother was a great stickler for the name, and did not like to leave any thing out of the name, and mentioned that he had often urged his brother to do something very decent for young *William;* his brother said he wished to do so, but said the young man might die without heirs, and the estate would go out of the family; but there was an understanding between him and his brother, that if young *William* was to marry and get a male heir, that then he had it in his power, as he expressed it, to do something very decent for him. Mr *Hoge* and deponent never had any conversation after that on the subject. He has known young *William* from a child; his character good; and it was his opinion that deceased took notice of him when a child. He does not know that deceased ever gave him a cent, but *John Hoge* did, and put him in business, and was like a father to him.

*George Morgan's* deposition. Some time after the death of *William Hoge*, deponent had a conversation with Mr *John Hoge*, relative to the will of *William Hoge*. He stated the manner in which he had left it : one third of the real estate to himself in trust for young *William Hoge;* that this had been done by by his advice, or at his instance. Mr *Hoge*, as well as I can recollect, mentioned two reasons for this; the one he thought a wrong delicacy to Mrs *Hoge ;* the other, in case of *William Hoge's* dying without issue before Mrs *Hoge's* marriage or death, it might go to his mother's branch of the family, which with his brother's family pride he could not bear; and as it came from his father, it should be retained in the name, and did not think it ought to change its channel. Mr *Hoge* mentioned that he wanted his brother to do more for him ; but I think the amount of it was, that he replied it was sufficient. Mr *Hoge* then remarked that " with my brother I could go a certain length, but further he would not allow." I gave important employment to young *William*, in consequence of Mr *Hoge's* application ; and I also saw letters from Mr *Hoge* to officers in the army, recommending young *William* to office, one of which was to major *Reed.* During the time young *William* was with me, he was lamenting his situation in life. I told him he ought to have patience ; that he was well provided for, in at least Mr *John Hoge's* say so. He mentioned this frequently as a favourable trait in Mr *Hoge's* character, having a property left to him, and declaring it in trust for another, and also providing for a person in young *William's* situation. He had several conversations with Mr *Hoge*, and all went to the same point.

Young *William's* character good. That Mr *John Hoge* had advised his brother to provide for this young man, notwithstanding his birth. Young *William* depends on his own exertions for support. The business he gave him was the collection of 8000 or 10,000 dollars, and he did it with fidelity.

Plaintiff closed his testimony.

The defendants then gave the following evidence :

A deed of conveyance from *John Hoge* to *William Hoge*, son of *David Hoge*, dated the 24th day of August 1820, for the land in dispute, was read in evidence, and is in the following terms : " know all men by these presents, that whereas the late *William Hoge*, Esq. by his last will and testament, devised one third of his real estate in the county of Washington, Pennsylvania, to the undersigned, which devise, it is alleged and now believed, was in trust, with full power to select and grant the same to such of the male heirs of said testator, as he the undersigned might deem most worthy. And whereas, although it would be desirable to delay the execution or declaration of said trust for some time, on several accounts ; yet, taking into view, the sudden and violent disorder to which the undersigned is subject, and by which he has more than once been brought in an instant to the brink of the grave, he deems it now proper to make the declaration and execute the trust aforesaid, especially as he is advised that *David Hoge*, Esq. of Steubenville, Ohio, who is the natural guardian of the selected objects of the trust, and who is of that age that promises a continuance of life, can be fully authorized to make any disposition of the property devised, not incompatible with the views of the testator. And whereas, expectations have been excited by alleged incautious conversations of the undersigned, held with various persons previous to any certain knowledge he had of the said devise being in trust, which cannot now be gratified, because the trust has been made known to him. And it is, therefore, proper to make a distinct declaration on the subject, lest after the death of the undersigned, these incautious conversations might be used for purposes never in his contemplation and adverse to the views of the testator. Wherefore, now know ye, that in order to promote and accomplish the views of the testator, I, the undersigned *John Hoge*, trustee as aforesaid, do hereby grant, bargain and transfer unto *William Hoge*, son of *David Hoge*, Esq. of Steubenville, in the state of Ohio, and his male heirs and assigns, the whole of my right, title, interest and estate, in the premises devised as aforesaid, with all the hereditaments and appurtenances thereunto belonging. To have and to hold the said premises to the said *William Hoge*, son of *David Hoge*, to the only proper use and behoof of him the said *William Hoge*, son of *David*, his male heirs and assigns for ever ; subject, nevertheless, to a full and absolute power hereby reserved and granted to the said *David Hoge*, Esq., to have and enjoy during his natural life, the whole of the premises so devised, and also with full power and authority, if he should deem it proper and necessary,

[Hoge v. Hoge.]

to sell and dispose of or otherwise use the same for the education and advancement in life of his male children only, and particularly of the said *William*, his son.   And I do hereby relinquish all power, control and interest in the property or estate devised to me for the purpose aforesaid.   In testimony whereof, I have hereunto set my hand and seal, this twenty-fourth day of August, in the year of our Lord one thousand eight hundred and twenty."

Acknowledged before *James Blaine*, justice of the peace of Washington county, Pennsylvania, the same day, and recorded the 29th day of the same month.

The deposition of *John Hoge* was next read in evidence, in which he testifies : that he is no way interested in the result of the suit brought by *William Hoge* against *Samuel Lyon.*   That he never intended to profit himself by the devise made by his brother *William Hoge* to him, of one third of his real estate, and never felt any interest in it further than what is to be derived from the pleasure of bestowing on merit.   That he knew that his brother *William* had the utmost confidence in him, and believes it was that confidence as well as affection, that induced his brother to make the devise, but he never could be certain from any information received from Mr *M'Giffin*, or otherwise, until he heard his testimony on the 12th of August 1820, that the devise to the deponent was in trust; and deponent therefore never could say that it was a trust estate for the use of any one, though he knows he did designedly insinuate something like it, as he had no fear that young *William* would or could claim all, especially as deponent knew that all aid had been repeatedly refused for him in the deponent's brother's lifetime.   And as a trust had been spoken of in the country, deponent did apprehend that if others instituted an inquiry, that he might by some legal construction be obliged to exclude young *William* altogether, and therefore often said that one third of the devise to deponent was for him at any rate.   But after Mr *M'Giffin's* offer to purchase, without mentioning the trust, all doubt on the subject vanished, and deponent never spoke or thought of a trust afterwards, because he believed if Mr *M'Giffin* would purchase, he had heard nothing which would militate against the views of the deponent ; and until the testimony of Mr *M'Giffin* was taken before *James Blaine*, Esq. on the 12th, as before stated, the deponent believed that he had full power, whatever doubts might be entertained by others, over the estate ; and that the confidence or trust reposed in him by his brother, was a confidence that he would dispose of the estate devised, in the same manner that he would of his other property, viz. to the most promising male or males of the family, for the establishment of a male branch or branches, and thus give a fixed habitation and preserve the name in the country.   Under the persuasion that he, the deponent, was not limited by any trust, he had determined on the manner in which he would bestow the estate ; which was, one third to young *William*, who now claims the whole as a trust estate ; and the remaining two

w

[Hoge v. Hoge.]

thirds to his brother *David,* who had not been provided sufficiently for by his father, or otherwise such part of the two thirds to him as would enable him to educate his sons and fit them for the world, reserving any balance that might be to bestow on such one of his sons as should appear to him to merit most hereafter. With this view, deponent was much pleased with Mr *M'Giffin's* offer to purchase, not only because it would enable deponent to provide immediately for young *William,* but also because, in his mind, it did away the idea of a trust, of which there might be doubts, and which had been spoken of in the country. Such was the anxiety of deponent to provide immediately for young *William,* that when Mr *M'Giffin* declined to purchase, and the change of times forbade the prospect of a sale for money, he commenced operations to induce a wealthy merchant to purchase, and designed to offer to take one third of the price in goods, which he meant to bestow on young *William,* and credit the balance to suit the purchaser's convenience, and he engaged Mr *Campbell* to procure a division of the estate, that he might be enabled to close a bargain, if a purchaser offered for the land. That the deponent had taken young *William,* without education, character or friends, and fitted him for the world, and must feel for his comfort and prosperity in it; and the deponent was, therefore, sorry when he heard the testimony of Mr *M'Giffin,* relative to the trust, as it obliged him, against his will, to change his course and be bound by the wishes of the testator. These wishes the deponent must collect from a variety of conversations which he had with the testator, as he has no other direction on the subject. The deponent states, that his deceased brother *William* and himself were in the habit of the most friendly communication of opinion, and he never, on any occasion, omitted to press upon his brother the propriety and duty of doing something for young *William;* he even ridiculed the distinction between legitimate and illegitimate children; and the deponent declares that his brother never on any occasion consented to do any thing, except furnishing a horse, saddle and bridle, after he, the deponent, had succeeded in getting young *William* appointed to an office, which required a horse when called on a tour of militia duty. The deponent further states that he has spoken with different persons of the pains he took with his brother on the subject, and he finds by the testimony he heard on the 12th, that he has been very much misunderstood. Mr *Swearingen,* one of the witnesses, said, allowance ought to be made for him on account of the distance of time, his age and bad hearing; and the deponent must ascribe the gross mistakes of others to his blundering attempts to serve young *William,* and their inattention to his observations, for it might be unfair to ascribe their mistakes to a worse motive. The objections of the deponent's brother *William,* he states positively, were always against making any provision for young *William,* and not as to the mode of doing it; and the deponent could not say, with truth, that the deceased was willing to provide for him, for he was always un-

[Hoge v. Hoge.]

willing ; and if it had not been for this unwillingness, deponent would have had young *William* provided for long before his brother's death.   The deponent's brother often urged, in conversations had with him, when pressed hard, that young men did as well generally without patrimony as with it ; that estates in prospect did great mischief ; that, at any rate, he was not bound to do any thing, for, from the infamous character and profession of the mother, young *William* had as great a chance to be son of any one among twenty or more, as to be his ; and that if there was no other reason, this last was sufficient—that he could not give money ; and personal property such as he had, would be of no use ; and that, in a word, he was determined to do nothing.   And the deponent says positively, that his brother and himself never spoke of a devise to young *William*, nor to any other person, nor had he the most remote notion of his brother's death, or any prospect of outliving him, who was a very temperate man ; nor did the idea ever enter deponent's head, that any of the conversations with his brother had any view to his death until after his will was made and he unable to converse much on any subject, when it occurred to deponent's mind that perhaps some of his brother's last observations relative to the division of estates, had that event in view.   So far was the deponent from knowing of any thing intended to be comprised in his brother's will, that the first intimation he had of a will at all, or of being considered in it, was from *Andrew M'Clure*, after his brother's death, to whom the deponent immediately said he was glad of it, as it would enable him to provide for young *William* and others who had been neglected.   The last conversation which the deponent had with his brother in relation to young *William*, or indeed on any other subject, was the day before he set out to Fayette county for merino sheep ; and the same day he wrote for Doctor *Wilson*, of Steubenville, to attend his brother, about a week before his death.   He was then in no apparent danger, but had no confidence in the physicians of Washington, and the deponent thought it best to have the aid of some one.   Previous to this last conversation, deponent had on several occasions suggested the propriety of giving to young *William* a lot, and assisting him a little to sink a tanyard and commence business, being a tanner by trade ; which, as the deponent has stated, his brother always refused to do.   In this last conversation, only about a week before his death, the deponent suggested the giving to young *William* a piece of ground, at which deponent's brother became angry, and said, "Do you think I would give part of this estate to *Peg Treanour's* son ; no, this I got from my father, and I have no right to divert it from the family."   Deponent interposed, and assured him that it was a piece of out-land that was meant, which would suit for a tanyard for a beginner. He became cool, and said he had no land of the kind ; but added, "As you appear to be so much interested on this subject, you had better give some land yourself."   Deponent then answered he would,

[Hoge v. Hoge.]

if his brother would exchange some land with him or repay him in any way; and that if the deceased was unwilling, from any family cause unknown to deponent, to do any thing publicly for young *William,* and would authorize deponent and provide the means, that deponent would apply them sparingly, and only as the young man's merit would justify; but a devise, as stated by Mr *M'Giffin,* was not mentioned or thought of by deponent on this or any other occasion. Deponent's brother, on this last effort made for young *William,* pointedly refused to do any thing, as he had always done before, and begged that deponent would not introduce the subject again.   This was about a week before his death, and when the deponent returned from Fayette, his brother's will was made without any concert with him, or the probability of having any; nor did his brother, either before or after the will was made, speak of it or say one favourable word of young *William.*   There certainly was no trust in favour of young *William,* to the knowledge of the deponent; but on the contrary, as appears by the conversations stated, he was always excluded from any aid, sometimes with anger, and always with firmness, accompanied often with a denial of the relationship; and on this last occasion deponent was forbidden to mention his name again, and this, as is stated, about a week before the death of the testator.   These things deponent certainly stated in part to Mr *M'Giffin,* perhaps confusedly and avoiding the strong objections his brother had to young *William,* because deponent was afraid of his exclusion, not of his taking all, in case the confidence in deponent, as expressed to Mr *M'Giffin,* by his brother, amounted to a trust in law.   The terms of the trust could be known to no one but deponent, and as he did not then believe the confidence so expressed by his brother amounted to a trust, he did not think himself called on to state the strong objections of his brother to young *William.*   And the deponent felt confident, as he did still until he heard Mr *M'Giffin's* testimony, that his brother did not mean to confine his power, but left him free to act as he would with his other property.   The deponent states that his conversations must have been misunderstood, and have been consequently misrepresented.   One error is, by ascribing his observations to his brother, and another great one is by supposing any of his conversations with his brother related to the final disposition of his estate, when they referred exclusively, so far as young *William* is concerned, to some small beginning for him.   Deponent further states, that he is not surprised, when such a man as Mr *M'Giffin* misunderstood him, at the gross testimony of *Graham* and *Morgan,* to whom he might have said, before Mr *M'Giffin* offered to purchase, that if the devise made to him was in trust, one-third of it should go to young *William;* thus insinuating that the trust was for him; but more the deponent did not say, and never on any occasion went further than insinuation in favour of young *William,* as this deponent thinks and believes.   The appointment of Mr *M'Giffin* as an executor, would seem from the testimony to be the result

[Hoge v. Hoge.]

of a recommendation made by the deponent to his brother of Mr *M'Giffin* as such, than which nothing can be more untrue; when it may be true that the deponent indirectly contributed to it, and may have said so, but if he did, it was by his constant recommendation of Mr *M'Giffin* to his brother and others, as a young man of honour, who promised well; and if Messrs *Cook* and *Huston* were dead before his brother, Mr *M'Giffin* being executor for them, at least one of them, by deponent's advice, might have been mentioned by him in conversation to his brother, but he never could have suggested Mr *M'Giffin's* name in any other way, because deponent and his brother never spoke of a will, nor did deponent know that his brother intended to make one.

The deponent further states, that he recollects the conversation he had with Mr *M'Giffin*, in which it is alleged that the trust was mentioned, and now positively declares that he heard no such expression, whatever Mr *M'Giffin* may have said or intended to say. If a trust, in words, had been mentioned and heard, the deponent would have attended to it, because it would have defeated his private object of providing for young *William*. Deponent minds Mr *M'Giffin's* words on that occasion. They were these, he said, when the deponent's brother mentioned the devise to him, there was a pause, that he, Mr *M'Giffin* looked at deceased and said, " What, is there nothing more ? no, was the answer, I have full confidence in my brother *John*;" and deponent now avers that this is all he heard of the trust from Mr *M'Giffin* until he heard his testimony. The deponent states, he understood the confidence as above expressed, referred to his conversations with his brother on the policy of Pennsylvania, and he is sure if he had heard the word "trust" mentioned, he would have recollected it, because he immediately revolved in his own mind, whether he could not gratify his wishes in relation to young *William*, and yet substantially comply with the expectations of his brother, especially if *William* should have male issue. The many conversations which deponent had with his brother, from which any limitations to his power over the estate can be inferred, relate principally to the policy in Pennsylvania of dividing estates, which both disapproved of, as calculated to destroy or prevent the establishment of a national character; and deponent and his brother both concurred in the opinion, that national character could not be established without the preservation of family name, which only could be preserved by giving the real estate to the oldest son, and providing for the other brothers in the navy, army, learned professions or manufacturing establishments; and at all events, the real estate should never go to the females. This was a favourite topic with him, and deponent and his brother never met latterly but it was mentioned. It was the principal theme of conversation the last time deponent had any with his brother, and when deponent was about leaving him, he followed deponent to the room door, and asked with earnestness if " we understood each other on that subject ?"

[Hoge v. Hoge.]

The deponent assured him that he had spoken his mind freely and without disguise, when his brother said, "Then I am satisfied," and deponent left him to go to Fayette, and did not see him again until after his will was made, and he on the very verge of life. The deponent believes that these conversations on the subject of estates, inspired his brother with confidence in him relative to the final disposition of the estate ; and though the devise may be a trust in law, and must be so considered on Mr *M'Giffin's* testimony, yet the deponent believes the design of the testator was to leave the selection of the object of the bounty to his choice, as character should be unfolded, having confidence that he would select such one or more of the males who promised the fairest to continue the family name ; and hence it must be that the testator said to Mr *M'Giffin*, "that it could be done in no other way, and that he had full confidence in his brother *John*;" for it is futile to suppose he referred to young *William*, as deponent was the trustee, to whom he had rejected every proposition for aid to the young man. Deponent further says, that his brother never offered any exchange of property with him, and Mr *Pentecost's* testimony must refer to an application to him by young *William* to purchase a tanyard then to be sold near Wheeling, which deponent told *Pentecost* he could not spare money or property to make, and that the young man must wait the death or marriage of Mrs *Hoge*, when he meant to give one third of the devise to him. The deponent states again, that there was no trust, or understanding between his brother and him, favourable to young *William*; but on the contrary, all aid was absolutely refused. That deponent now believes that his concealment of his brother's conversations relative to young *William*, when coupled with deponent's insinuations that he was provided for in the will, has contributed in some degree to the testimony given, and, for want of due confidence, has caused the present suit ; and deponent can only justify himself from his strong wish to serve young *William*, and his impression that the devise was not a trust, whatever the law might make of it ; but it now appears it was a trust reposed in him by his brother, in confidence that he would attend to a family establishment, which his brother discovered could not be done by himself, as he was about to be cut off before the characters of his nephews were developed, and therefore, as he told Mr *M'Giffin*, it could be done in no other way.

*David Morris* was affirmed ; and testified: that very shortly after the death of *William Hoge*, his brother *John* came to affirmant's house, when affirmant asked *John Hoge* if his brother *William* had made a will; he replied that he had, and had given one third of his real estate to his brother *David's* male heirs, another third to his brother *Jonathan's* male heirs, and the remaining third to himself. Affirmant then inquired if he had left nothing to his son *William* (the plaintiff). He said he had not ; that he had often solicited his brother *William* to give young *William* something, but he had always refused and persisted in it till the last. This was the first

[Hoge v. Hoge.]

time that I saw *John Hoge* after the death of his brother ; it was but a few days after his death ; within a week any how.

The defendants then gave in evidence the record of an action of ejectment, commenced in the court below, to April term 1820, by the plaintiff, against *Samuel Lyon,* then tenant in possession of the land in dispute, which was referred to arbitrators mutually chosen by the parties, and on the 29th of August 1820, was discontinued by the plaintiff.

The defendants gave in evidence a deed of conveyance and release from the plaintiff and his wife, dated August the 29th 1820, to *David Hoge,* in the following words, to wit : " this indenture, made and entered into, between *William Hoge* and *Sophia* his wife, of the borough of Washington, county of Washington, and state of Pennsylvania, of the one part, and *David Hoge,* of the borough of Steubenville and state of Ohio, of the other part, witnesseth—that the said *William Hoge* and *Sophia* his wife, for and in consideration of 3000 dollars, to them in hand well and truly paid, by the said *David Hoge,* the receipt whereof is hereby acknowledged, have remised, released, granted, bargained and sold, and do hereby grant, bargain and sell, remise and release, and for ever quit claim, unto the said *David Hoge,* his heirs and assigns for ever, all the right, title, interest or claim of them, the said *William* and *Sophia,* of, in or to all and every part of the real, personal or mixed estate of the late *William Hoge,* brother of the said *David.* To have and to hold the premises hereby granted and released, or intended to be so granted and released, unto the said *David Hoge,* his heirs and assigns for ever, together with all and singular the buildings, rights or appurtenances thereunto belonging or appertaining. And the said *William* and *Sophia* his wife do hereby covenant to warrant and defend the same, to the said *David Hoge,* his heirs and assigns, against them, the said *William* and *Sophia,* their heirs and assigns for ever. In witness whereof the said *William* and *Sophia* have hereunto set their hands and seals, this twenty-ninth day of August, in the year of our Lord one thousand eight hundred and twenty."

Acknowledged the same day before *James Blaine,* a justice of the peace, and recorded on the same day.

A bond which had been executed at the same time with the deed of conveyance last aforesaid, and bearing even date therewith, by *David Hoge* to the plaintiff, in the sum of 8000 dollars, conditioned for the said *David Hoge's* conveying in fee simple to the said plaintiff four hundred acres of land, situated on Cool Spring Creek, or the waters thereof, above *Benjamin Stokely,* in the county of Mercer and state of Pennsylvania, so soon as a selection thereof and survey should be made by the said plaintiff, or within a reasonable time thereafter, attested by *Parker Campbell* and *T. M. T. M'Kennan,* was given in evidence.

The condition of this bond had been performed by *David Hoge,* taken up by him and cancelled. A certified copy of the deed of con-

veyance, which had been executed by *David Hoge* and *Jane* his wife, to the plaintiff, dated October 4th 1821, in fulfilment of the condition of said bond, whereby the said four hundred acres were conveyed in fee simple to the plaintiff, was then read in evidence.

A certified copy was then given in evidence, of a deed of conveyance in fee simple, from the plaintiff and his wife to *William Zahniser*, dated the 22d day of November, A. D. 1821, for one hundred and twenty-five acres and thirty perches, part of the aforesaid four hundred acres—consideration 500 dollars and 75 cents; as also a certified copy of a deed of conveyance from the plaintiff and wife, conveying the residue of the said four hundred acres to *William North*, in fee simple, for the consideration of 440 dollars, and dated the 18th day of March 1822.

These deeds were all recorded in the recorder's office of Mercer county, Pennsylvania.

*Thomas M. T. M'Kennan*, Esq. then testified that he and *William Baird* were counsel for the plaintiff in the former action of ejectment brought for the land in dispute. That that suit was compromised, and that the deed of conveyance and release read in evidence, from the plaintiff and his wife to *David Hoge*, and the bond aforesaid, given by the said David to the plaintiff, were given and executed in pursuance of the agreement of compromise, which then took place between them in relation to the land in dispute, and that the former action of ejectment was discontinued also in pursuance thereof. The compromise was made upon a trial of the cause before arbitrators, and after the testimony, as witness believed, had been gone through on both sides. The compromise was made between the parties with the approbation of the counsel of both sides.

The defendants' counsel requested the court to charge the jury upon these points. 1st. That the devise of one-third of the real estate of the testator, *William Hoge*, being given to *John Hoge*, in fee simple, absolute, and without any trust being mentioned in or on the face of the will itself, it cannot be established by the declarations or communications of the testator to the person who drew the will, that it was a trust; but that he must leave it to the devisee to dispose of it, as he had confidence in him, and did not say for whom the trust was designed; nor can a trust in connexion with such declarations of the testator be established by the subsequent declarations of the devisee in the will, made after the death of the testator, that it was given to him in trust for the plaintiff.

2. That a trust cannot be created and established contrary to the face of the will, by the parol declarations of the testator, or the parol declarations of the devisee named in the will, or by both in conjunction.

3. That every devise to the person named in the will, imports a consideration; and, therefore, no averment contradicting the idea that the devise was not intended exclusively for the benefit of the devisee so named, can prevail or defeat the devise in the will.

[Hoge v. Hoge.]

4. That the plaintiff, although he may be an illegitimate son of the testator, is, notwithstanding, to be considered as a mere stranger: that no such relationship existed thereby, as could either in law or equity form a good, much less a valuable consideration; and that, had the testator, or *John Hodge* the devisee named in the will, made a contract without other consideration, to convey the land in dispute to the plaintiff, it would not avail or give the plaintiff any right to the land.

5. That if the plaintiff even had any equitable claim to the land in dispute, any unreasonable delay on his part to prosecute the claim, will in equity, as well as law, be sufficient to defeat it.

6. That the compromise made in this case, during the pendency of the former action of ejectment, by the plaintiff, for the land in dispute, by which that action was discontinued by the plaintiff, and the plaintiff released his claim thereto to *David Hoge*, is a bar to the plaintiff recovering the land in this action, if fairly made without any fraud committed by *David Hoge* on the plaintiff.

7. That the compromise will be good and binding on both parties, even if it should be that the party releasing his right had the better title. It is sufficient that there was a real dispute.

8. If the plaintiff has received a conveyance, and a title thereby to four hundred acres of land in Mercer county of this state, on the faith of the compromise, and as a part of the agreement of the compromise itself, were the compromise even void on account of fraud, the plaintiff could not rescind and set aside the compromise for that reason, without reconveying and reinvesting *David Hoge* with the title to the land, so conveyed by the said *David Hoge* to the plaintiff, and that without this being previously done by the plaintiff, he cannot recover the land in dispute in this action.

9. Unless fraud has been proved to have been practised by *David Hoge* upon the plaintiff, in making the compromise, it is good and binding upon the plaintiff, and bars him of this action.

10. That even supposing *John Hoge* had perjured himself in the testimony which he gave before the arbitrators, by whom the former action of ejectment brought for the land in dispute was to be tried, and *David Hoge* had no knowledge or reason to believe that it was so, that would not avoid the agreement of compromise; that the plaintiff would be bound by it, and barred by it from recovering in this action.

11. That if such perjury would be sufficient to avoid the agreement of compromise, yet it could not be done without putting *David Hoge* in the same state and condition that he was in at and before the time of compromise, by restoring to him the land in Mercer county, which he conveyed to the plaintiff in pursuance of the agreement of compromise.

The plaintiff requested the court to charge the jury: 1. That the defendant, taking under *John Hoge* as a volunteer, stands in his

x

shoes, and consequently, if *John Hoge* was a trustee for the plaintiff, the defendant is a trustee also.

2. That if the jury believe that the release made to *David Hoge* by the plaintiff, was obtained through the misrepresentations of *John Hoge*, and in consequence of the influence of his testimony, and the persuasion of the arbitrators, it is not binding.

3. That if the release was procured or induced by the fraud, falsehood, imposition or influence of *John Hoge*, it is void, however innocent *David Hoge* may be.

4. That if obtained through oppression, in consequence of the plaintiff being so oppressed with his situation that he was glad to make any terms, it is not binding; and that great inadequacy of price is evidence of oppression, and that the mere absence of fraud is not sufficient to sustain the release.

5. That fraud may be inferred from the nature and circumstances of the transaction, and the connexion of the parties.

6. That if the compromise was obtained or brought about by the fraud or undue influence of any one, it is not binding.

The court charged the jury—

This is an action for one undivided third part of a tract of land in Canton township, adjoining the borough of Washington. It is admitted that the late *William Hoge*, Esq. was owner of the land. He made his will, (*prout* will), in which he devised one third part to the male heirs of his brother *Jonathan Hoge*, deceased, one third part to the male heirs of his brother *David Hoge*, and the remaining third to his brother *John Hoge*. This last is the part in dispute. Both parties claim under this devise. The plaintiff alleges that the testator intended this part of his estate for him, he being his illegitimate son; and that the devise to *John Hoge* was in trust for his benefit. It is contended, on the other hand, that if there was a trust, it was in confidence that *John Hoge* should select some one as the recipient of the benefit, in conformity with the known views and wishes of the testator in relation to the transmission of the estate to support the family name, &c. Defendant claims that *John Hoge* has discharged the trust, by conveying to him, &c.

For reasons which are known to the counsel, it is not our intention to remark at all upon the facts of this case. We shall leave them entirely to you, and confine ourselves to a brief notice of the legal points submitted on both sides. It is a matter of regret that we have not had time to examine in a satisfactory manner the many important principles involved. We are relieved, however, by the reflection, that our errors will be corrected by the superior tribunal to which it will no doubt be removed.

1st point submitted by plaintiff. Answer. The defendant taking under *John Hoge*, stands in his shoes; and if *John Hoge* was a trustee for plaintiff, the defendant must be so also. He is not a purchaser for a valuable consideration without notice. (Deed from *John Hoge* to *William Hoge*.)

[Hoge v. Hoge.]

1st, 2d, and 3d points submitted by defendant's counsel. Answer. The devise of one third of the real estate of the testator *William Hoge*, being given to *John Hoge* in *fee simple* absolute, and without any trust being mentioned in or on the face of the will itself, it cannot be established by the declarations and communications of the testator to the person who drew the will, that it was a trust, but that he must leave it to the devisee to dispose of it. He had confidence in him, and did not say for whom the trust was designed. We think, however, that in connexion with such declarations of the testator, the subsequent parol declarations of the devisee, clearly and distinctly expressed after the death of the testator, that it was given to him in trust for the plaintiff, may establish such trust, if fully proved and believed. That though a trust cannot be created and established contrary to the form of the will, by the parol declarations of the testator, or by the parol declarations of the devisee, separately and alone considered ; yet both of them in conjunction, if proved, may establish such trust. No averment can be allowed to defeat a will ; but the question here is, what was the will of the testator ?

If you find, from the parol declarations of the testator, and the parol declarations of the devisee, which we have allowed in evidence, that *William Hoge*, the testator, did intend that the devise to *John Hoge* should be for the use and benefit of *William Hoge* the son— we say that such is the will of *William Hoge* the testator, and it would be fraud to defeat it, and *John Hoge* would hold as a trustee.

4th. To the fourth proposition of the defendant, we answer generally in the affirmative. If, however, the plaintiff was acknowledged by the testator to be his illegitimate son, he was under a moral obligation to provide for his support and advancement. This may be regarded in arriving at his intent. It would be a good consideration for a devise.

5th. We say that if the plaintiff ever had an equitable claim to the land in dispute, any unreasonable delay on his part to prosecute the claim, will, in equity as well as law, be sufficient to defeat it. We do not say, however, that such unreasonable delay existed in the present case as will prevent the plaintiff recovering.

6th. The compromise made during the pendency of the former ejectment by the plaintiff for the land in dispute, by which that action was discontinued, and the plaintiff released to *David Hoge* his claim, we think is a bar to the plaintiff recovering the land in this action, if fairly made, without any fraud practised by *David Hoge* or (any one with his privity), or any undue advantage taken of the plaintiff's ignorance, mistake or necessities.

7th. The compromise will be good and binding on both parties, even if it should be that the party releasing his right had the better title. It is sufficient that there was a real dispute; not a mere pretended and colourable defence.

Answer to second, third, fourth, fifth and sixth points of plaintiff, and ninth and eleventh of defendant. But should you suppose that

[Hoge v. Hoge.]

the release made to *David Hoge* (*prout* release) by plaintiff, was obtained through the misrepresentation of *John Hoge*, and in consequence of the influence of his testimony and the persuasions of the arbitrators, it is not binding, if *David Hoge* knew of such misrepresentation, and availed himself unduly of such influence and persuasions.

Again, should you find that the release was procured or induced by the fraud, falsehood, imposition or influence of *John Hoge*, it is void, however innocent *David Hoge* may be, if the agency or interference of *John Hoge* was employed to effect the arrangement.  But if *David Hoge* knew of no such misrepresentation, nor had unfair advantage from such influence and persuasions, if he was not privy to any fraud, falsehood or imposition on the part of *John Hoge*, nor had his interference in effecting the compromise, even supposing *John Hoge* had perjured himself in the testimony which he gave before the arbitrators, and *David Hoge* had no knowledge or reason to believe it was so, the agreement of compromise will not be avoided.  The plaintiff would still be bound by it.

The circumstances of the plaintiff at the time the release was given, will not render it invalid, unless you find that *David Hoge* took advantage of his embarrassed situation to drive an unconscionable bargain, contrary to justice and fairness.  In such case the mere absence of actual fraud is not sufficient to sustain the release.  In determining the question of fraud, the nature and circumstances of the transaction, and the connexion of the parties, may be regarded. Gross inadequacy of price may be evidence, connected with other circumstances, of overreaching.

8th and 11th of defendant.  If the plaintiff has received a conveyance and a title thereby to four hundred acres of land in Mercer county, upon the faith of the compromise, and as a part of the agreement, and the compromise were void on account of fraud in the perjury of *John Hoge* at the trial of the former ejectment; yet the plaintiff cannot rescind and set aside the compromise, without placing *David Hoge* in the same, or as good a condition, as he was at and before the agreement, by restoring to him the land in Mercer county; or, if he has disposed of that before the discovery of the fraud or perjury, so as to put it out of his power to convey, by paying to him the fair value thereof.  This must be done before he can have the land in dispute.  But if you should find for the plaintiff, on the other points of the case, you can make provision in your verdict for the security of *David Hoge* in this particular.

After this charge of the court, the jury found a verdict for the plaintiff, possession to be delivered on payment or tender in cash of 940 dollars and 75 cents to the defendant; upon which the court below rendered a judgment.

Assignment of errors.

1. The court below erred, in receiving the parol evidence, which went to alter and contradict the will of the testator, *William Hoge*.

2. In charging the jury, that, as to the question, what was the

[Hoge v. Hoge.]

will of the testator? they were to decide it from the writing in connexion with the verbal declarations of the testator, and of the deviseee, *John Hoge*, named in the written part.

3. In charging the jury that the circumstance of the plaintiff below, being reputed the bastard son of the testator, was a sufficient consideration to raise and support a trust in real estate, created by words merely spoken and not reduced to writing.

4. In telling the jury that the court would not say that the delay of the plaintiff below to prosecute his claim, which at most could not be called more than equitable, was a bar to his recovery, when it ought to have said so.

5. There is error in the answer of the court below to the sixth point proposed by the defendants then to be answered for the instruction of the jury; it is vague and ambiguous, especially in the following words, "or any undue advantage taken of the plaintiff's ignorance, mistake or necessities," without saying whether ignorance or mistake of the facts or the law was meant; and therefore calculated to mislead the jury.

6. The court omitted to answer the ninth point of the defendants below.

7. The court erred in telling the jury, that if they should find for the plaintiff below upon the other points beside that of reconveying the land in Mercer county, that they might, notwithstanding no reconveyance had been made or tendered by the plaintiff below to *David Hoge*, find for plaintiff; but make provision in their verdict that the plaintiff should not obtain possession of the land until a reconveyance of the Mercer land should be made, or the value thereof tendered or paid by the plaintiff to the defendants.

8. The court erred in rendering judgment for the plaintiff below, instead of for the defendants.

*W. W. Fetterman*, for plaintiff in error.

As to the first error assigned: I take it to be well established and fully settled, that no averments can be allowed or parol evidence admitted, to alter, vary, contradict or explain a will in writing. In *Cheney's* case, 5 *Coke* 68, Sir *Thomas Cheney*, by his will in writing, devised to *Henry* his son divers manors, and to the heirs of his body, the remainder to *Thomas Cheney*, of Woodby, and to the heirs male of his body, on condition "that he or they, or any of them shall not alien, discontinue," &c. It was offered to prove by witnesses that it was the intent and meaning of the devisor to include his son and heir within these words of the condition "he or they," and not only to restrain *Thomas Cheney*, of Woodby, and his heirs male of his body: but it was resolved that the testimony could not be received, "for the will concerning lands, &c. ought to be in writing, and the constructions of wills ought to be collected from the words of the will in writing, and not by any averment out of it; for it would be full of

great inconvenience, that none should know by the written words of a will, what construction to make or advice to give, but it should be controlled by the collateral averments out of the wills. So in the case of *Brett* v. *Rigden, Plowd. Rep.* 345, it was unanimously agreed by all the justices, that where the testator had devised his lands to B and his heirs, who died in the lifetime of the testator, who after the death of the devisee told C, the son and heir of B, in the presence and hearing of many witnesses, that he, the said C, should be heir to him the testator, and should have all the lands which B his father should have had by his last will and testament, in case he had survived him, (the testator) " was of no effect in law, and no regard ought to be given to it; inasmuch as it was not written in his last will. For the statutes of 32 and 34 *Hen.* 8, give liberty and authority to every one to devise his lands by his last will and testament in writing." In which case, *all that can make the devise effectual ought to be in writing.* " And if the rest which is in writing, is not sufficient to make the lands pass without the words spoken to *Thomas,* (that is C) the son, then it follows that the substantial matter, which would make the land pass, is not written, but rests in words only, and is not within the statute, for no will is within the statute but that which is in writing; which is as much as to say that all that is effectual, and to the purpose, must be in writing, without seeking aid of words not written." *Godolph. on Leg.* 52; *Gilb. on Devises* 90; 6 *Cruise's Dig.* 1934; *Cases* 39, 40, 41, 42 and 43.

The deposition of a person who prepared a will was offered to be read, to prove the declarations of the testator at the time he gave the instructions for his will, respecting his intention of giving his wife the several devises and bequests mentioned in the will, *over and above her* jointure, but Lord *Bathurst* would not suffer such evidence to be read. 1 *Cruise's Dig. tit.* 7, *ch.* 3, *sec.* 12, *page* 248; *Broughton* v. *Erington,* 7 *Bro. Par. Ca.* 12. This last case was taken to the house of lords, and the decision of the chancellor there confirmed. See also the case of *Towers* v. *Moon,* 2 *Vernon* 98. So in the case of *Ulrick* v. *Litchfield,* 2 *Atk.* 372. *Mary Parivicine* gave her real and personal estate to the plaintiffs, equally between them; and on the death of one of them, the whole estate of *James Ulrich,* in tail; and for want of such issue to *Richard Ulrich* in fee, with a few pecuniary legacies, and charged her real estate with the payment, if the personal estate should not be sufficient, and by *her will declared she gave all the rest and residue of her personal estate to her uncle Leonard Collard's three daughters.*

The counsel for the residuary legatee offering to read the parol testimony of the attorney who drew the will, that he had express directions to give the personal estate to the three daughters of *Leonard Collard:* Lord *Hardwicke* said, " I am of opinion it is not a case in which parol evidence can be read, and would be of dangerous consequence; it is true there are some things here which would make a judge wish to admit it; but I must not follow my inclina-

[Hoge v. Hoge.]

tions only, for I do not know that upon the construction of a will, courts of law or equity admit parol evidence, except in *two cases :* first, to ascertain the person when there are two of the same name, or else when there has been a mistake in the christian name or sir-name, and this upon an absolute necessity, as in Lord *Cheney's* cases, where there were two sons of the name of *John,* 5 *Co.* 68, and if the court had not let in such evidence, it would have made the will void, notwithstanding there was such a person as *John,* &c. and the doubt was only which of them was meant ; and notwithstanding too the heir at law was already disinherited.    The second is with regard to resulting trusts relating to *personal estate.*    When a man makes a will and appoints an executor with a small legacy, and the next of kin claims the residue.    In order to rebut the resulting trust for the next of kin, parol evidence was admitted to ascertain the person who was to have the residue, in the case of *Littleburg* v. *Buckly, Eq. Ca. Abr.* 235, and the *Countess* v. *The Earl of Gainsborough,* 230.

Likewise in the case of *Brown* v. *Selwyn, Ca. temp. Talbot* 240, *John Brown* devised the residue of his real and personal estate, not before devised, to his two executors, &c.    One of them is indebted by bond to the testator.    Held, by Lord Chancellor *Talbot,* that this bond debt is not released thereby, but shall be divided between them, and no parol evidence shall be admitted, that the testator intended to release it to the obligor, and had given instructions for that pur-pose to the attorney who drew his will.    This decree was affirmed in the house of lords, where they would neither allow the parol evi-dence, nor the respondent's answers to be read as to this point.    See *Ca. temp. Talbot* 240, 243, 244; *Bro. Par. Ca.* 179.

Also, in the case of *Torbert* v. *Twining,* 1 *Yeates* 432.    It was de-cided by the supreme court of this state, that parol evidence is inad-missible to *supply, contradict* or *explain* the written words of a will. In this case the testator, *David Twining,* had, by his will, dated the 25th of October 1791, devised, *inter alia,* considerable real estate to his daughter *Beulah* (wife of *Torbert* and one of the plaintiffs).    And afterwards, on the 12th of November 1791, by codicil thereto, devised as follows—" *Item :* Whereas I have given in my last will all my lands that are not already bequeathed unto my daughter *Beulah Tor-bert,* for and during her natural life, with all the rents, issues and profits; but on further consideration of it, I do give all the lands and tenements and appurtenances, thereunto belonging, unto my loving brother, *Jacob Twining* and friend *Thomas Story,* in trust for the use, benefit and behoof of my daughter *Beulah Torbert,* for and during her natural life, they, or the survivor of them, to rent out, in the best manner they can, *so that no waste is made of the timber,* and the best care that can be to preserve the land *from abuse by extravagant tillage.* She, my said daughter *Beulah,* to have *all the rents, issues and profits* ensuing from the aforesaid plantation, for and during her natural life, and at her decease I do give the aforesaid plantation unto the *male heir* or *male heirs* of her body, &c."    Depositions were agreed to be made

part of the case, which went to show that the testator declared in his last sickness, that his intention in making the codicil was, that the real estate therein devised to his daughter *Beulah*, should be *for her sole and separate use:* and, after he had made his codicil, he declared that he expected he had effected his purpose, and that her husband could not intermeddle with it. Now in this case it was manifest from the written will, as well as the codicil, that his daughter was the particular and special object of the testator's bounty, and the moving cause of the devise, yet the court would not admit the parol evidence, which certainly did not contradict this idea, but because it would have excluded her husband from all participation in the enjoyment of the devise, and have changed the legal effect of a devise to her use generally, the court felt themselves bound to reject it. To have received and given effect to such testimony, would have been to have made it part of the testator's will; and although not in writing, to have regulated and restricted the enjoyment of the testator's real estate at his death. This would have been in direct contravention to our statute on the subject of wills.

The first section of the act of 1705, *Purdon's Dig.* 800 (edit. 1824), provides that " all wills in writing, wherein or whereby any lands, tenements or hereditaments within this province, have been or shall be devised, being proved, &c., shall be good and available in law, for the granting, conveying and assuring of the lands or tenements thereby given or devised, as well as of goods and chattels thereby bequeathed." The 3d section, page 801, declares that " no nuncupative will shall be good, where the estate thereby bequeathed shall exceed the value of thirty pounds, that is not proved by *two or more witnesses,* who were present at the making thereof, nor unless it be proved that the testator, at the time of pronouncing the same, did bid the persons present, or some of them, bear witness that such was his will, or to that effect, &c." And by the fourth section it is further provided, that no testimony shall be received to prove any nuncupative will, if more than six months shall have elapsed after speaking the words, unless it, or the substance of it, was committed to writing within six days after the making of the said will.

Again, by the sixth section, " no will in writing, concerning any goods or chattels or personal estate, shall be *repealed,* nor any clause, devise or bequest therein be *altered* or *changed* by any *words,* or will by word of mouth only, &c."

According to this statute a will, in order to *pass real estate, cannot be made by word of mouth, under any circumstances.* Nor can it as to *personal* estate exceeding in value thirty pounds, unless done in the testator's last sickness, and after his death *proved by two witnesses at least,* who were required at the time to take notice that such was his will. And unless it be reduced to writing, within six days after the speaking of the words, no proof whatever can be received or admitted of it more than six months thereafter. Seeing the legislature have been so particular in respect to the admission of evidence, to

[Hoge v. Hoge.]

establish a nuncupative will, can it be imagined that they could have conceived that it would ever be attempted in the case of *real estate?* Even in the case of a will of personal estate, reduced to writing, they have expressly forbidden the *repeal* of it, or the *alteration* of a *single clause* in it, without committing it to writing. Yet, in the present case, the declarations of the testator *William Hoge*, made to *Thomas M'Giffin*, who drew the will, have been received in evidence to prove what! That the devise to *John Hoge* and *his heirs and assigns* was not intended for his use or benefit, although so expressly declared on the face of the will, but for some other person or persons. The admission of such testimony is in opposition to every principle of the common law; to the express provisions of the statute; to the decision of the courts of England, and of our own state on the subject. It is difficult to conceive a case, where the idea of a trust would be more incompatible with the devise contained in the will than the present. It must be observed, that the devise to *John Hoge* is an estate in fee simple. Now, who ever thought of *devising* an estate to a man and his heirs and assigns, who was designed to be a mere trustee? I must say that at this moment I have no recollection of such a case. How incredible! Yet let it come to the ears of jurors whose feelings have been excited and prepared in a particular way, and it is not only credible, but reasonable, just and righteous. Under some such sentiment the imaginations of witnesses are set to work, and fancy supplies the place of recollection, and it becomes impossible to calculate the consequences. Hence the danger in admitting such testimony at all.

In the case of *Duncan* v. *Duncan*, 2 *Yeates* 202, where a rough draft of the will in the testator's own handwriting was offered in evidence to show, from a clause or expression contained in it, and left out of the will that was executed, that a devise in favor of the widow was intended to be in lieu of dower, it was rejected by the court, who declared that "the will must be judged of *ex visceribus suis.*"

Again, in the case of *Sword* v. *Adams*, 3 *Yeates* 34, *Penelope Haley* had, *inter alia*, devised a house and lot in Philadelphia to her granddaughter *Mary Thompson, her heirs and assigns.* The granddaughter died in the lifetime of the testatrix; who, when she heard of the death of *Mary* her granddaughter, was desirous of providing for the event which had taken place, and to make a codicil to her will for the purpose of giving the property, which had been devised to the granddaughter *Mary Thompson, her heirs and assigns,* to an only child and son named *James,* which the granddaughter had by a Mr *Sproat* to whom she had been married, but was prevented by Dr *Nathaniel Dorsey, who was married* to another granddaughter of the testatrix, and by his wife entitled to one-ninth part of the estate of which the testatrix should die intestate. He informed the testatrix (though without any ill design) that as she had devised to her said granddaughter *Mary Thompson, her heirs and assigns,* that her son *James* must necessarily inherit the same, and that he completely

Y

[Hoge v. Hoge.]

answered the description of *her heir*. With these assurances, her mind was quieted, and she prepared for death without making any further alteration in her will. In addition to this parol testimony, the nuncupative will of the testatrix, which had been proved and established by two witnesses, showed her intention beyond all question. It was also deposed to by other witnesses, that they, not long before testatrix's death, heard her say that, in case of her granddaughter *Mary Thompson's* death, she intended the property for her child, and that it was secured to *them*. The court decided, though with great feelings of regret, that the parol evidence could not be received. They say "the case is perfectly clear at law, however hard it may bear on the infant *James Sproat*. *Private inconvenience must give way to the safety and security which must be the result of general principles long settled and sanctioned.* We have no hesitation in saying that the plaintiff is entitled to a verdict."

In the case of *Iddings* v. *Iddings*, 7 *Serg. & Rawle* 3; it was decided, that parol evidence is not admissible to show that a scrivener, in drawing a will, inserted words, of the meaning of which he was ignorant, in order to vary the effect of the dispositions contained in it, although it may be received to explain a latent ambiguity, or to rebut a resulting trust, or, *in case of fraud or mistake to annul the will*. The opinion of the court in this case is delivered by the late chief justice, who, after vindicating the propriety and justice of the rule that excludes parol evidence in such cases, with great force and perspicuity notices the only exceptions to it, and the reason of them. The last of which is in the case of fraud : he says parol evidence is admitted "not for the purpose of *explaining* or *altering* the writing, but of showing it to be *void*. If, instead of the will which a man has read and intends to execute, another is substituted which he executes, it is evident that this is not his will, and proof of this fraud is permitted. So, I apprehend, the truth might be shown, if, by *mistake*, the wrong paper was executed and the testator died before there was time to correct the error." Now, the plaintiff's counsel below does not pretend that he is entitled to the benefit of the parol testimony, under any of the exceptions to the general rule established on this subject except that of fraud ; but if it were to be admitted on this principle it could not entitle the plaintiff below to recover ; for according to Chief Justice *Tilghman* in the case above, the effect of it would not be to *change* or *alter* the devise in the will to suit his wishes, but to *avoid* it, which must necessarily set all colour of claim on his part aside.

I would also refer to the case of *Mann* v. *Mann*, on this subject, in 1 *Johns. Ch. Rep.* 231, where the principles and cases upon and in which parol evidence has been admitted, are very fully and learnedly set forth by Chancellor *Kent*. See also the opinion of Chief Justice *Thompson*, in *Mann* v. *Mann*, 14 *Johns.* 14, and also 11 *Johns.* 205; *Jackson* v. *Sill*, 8 *Mass.* 506, and *Smith* v. *Fenner*, 1 *Gallison* 172. I contend that the admission of the parol evidence in

[Hoge v. Hoge.]

this case was not only in violation of the true spirit and meaning of the statute of this state against frauds and perjuries, but more especially in direct contravention to the statute regulating wills for devising real estate. Although I admit that, by many decisions of courts, the statute of frauds and perjuries has not only been eluded, but in some degree repealed. Yet, in no instance, has the statute requiring wills to be in writing and proved in the manner therein prescribed, for the purpose of *passing real estate*, been evaded or disregarded by the admission of parol evidence. No case can be found where a devise of *real* estate by a will in writing has been established by the admission and effect of parol evidence; nor yet even upon the answers of the defendant. In the case of *Selwyn* v. *Brown*, in *Talbot's Cases* (see page 242 already cited), the house of lords refused to admit the respondent's answer. So it was held in *Lee* v. *Henley*, 1 *Vern.* 37, that no averment of a trust of real estate given by will can be received. See also the note of the late editor (*Raithby*) of these reports, vol. 1, page 30, note (1). It would seem from *Fane* v. *Fane*, 1 *Vern.* 30, that a trust of personal estate given by will may be averred. So of moneys arising from the sales of lands directed by the will to be sold; as appears from *Crumpton* v. *North*, cited in lady *Gainsborough's* case, 2 *Vern.* 253. The lord chancellor, *Cowper*, however, considered lady *Gainsborough's* case, and *Foster* v. *Munt* there cited, as being an innovation of the common law, in *Granville* v. *Beaufort*, 2 *Vern.* 649. All the cases cited by the counsel for the plaintiff below, to show that trusts have been established in the cases of wills by the introduction of parol evidence, relate to personal estate, or to an engagement to pay or allow money which is purely of personal character. *Thynn* v. *Thynn*, 1 *Vern.* 296, *S. C.* 1 *Eq. Ca. Abr.* 380, pl. 6; *Reech* v. *Kennegal*, 1 *Ves. Sen.* 123, *S. C. Amb.* 67; *Drakeford* v. *Wilks*, 3 *Atk.* 539; *Kingsman* v. *Kingsman*, 2 *Vern.* 559; *Devenish* v. *Baines*, *Prec. in Chan.* 3. This last case was a nomination by parol of a successor to copyhold; but it is there said that, according to the custom of the manor, an estate might be created therein by parol, without writing, and of course so might a trust, and therefore not with the statute of frauds and perjuries; and the court decreed a trust upon the promise and verbal engagement of the defendant in favour of the plaintiff. So in *Rookwood's* case, *Cro. Eliz.* 164. *Rookwood* having issue three sons, had an intent to charge his land with four pounds *per annum* to each of his two youngest sons for their lives; but the eldest son desired him not to charge the land, and promised to pay to them duly the four pounds *per annum*; to which the younger son, being present, consented; and he promised them to pay it. For non-payment, after the death of the father, they brought an *assumpsit*. The whole court held clearly that it was well brought. Which proves that such engagements to pay money, or any thing that is personal, have no relation to the statute of frauds and perjuries. In *Heisier* v. *Clarke*, 2 *Eq. Ca. Abr.* 46, 47, held that an agreement with respect

[Hoge v. Hoge.]

to copyhold lands need not be reduced to writing because not embraced by the statute. So a promise by an executor to his testator to pay all the legacies in the will, provided he would not alter, is binding, 2 *Freeman* 34 ; also, several others are mentioned in 1 *Raithby's* edition of *Vernon*, page 31, note (2), all of the same cast, but I repeat that no case can be found of real estate passing under such arrangement and of parol testimony being admitted to establish it. Indeed there are decisions to the contrary even in the case of personal estate. In the case of *Whitton* v. *Russel*, 1 *Atk.* 448, the testator left A 20 pounds *per annum* by codicil to his will, and after talking of making another codicil and leaving him 15 pounds per annum more, the attorney told him that if B, C and D, whom he had made devisees of his estate, would give A a bond to pay him 15 pounds *per annum*, it would be sufficient. Accordingly B, *one of the devisees present, promised that he and the devisees would*, and a draft was prepared but not executed. The testator lived five weeks after this transaction, and A remained nine years without demanding the performance of the promise, or insisting to have the draft perfected, and then brought his bill. The defendant denied his promise and the plaintiff's bill was dismissed at the rolls, who thereupon appealed. A number of the cases above were cited to sustain the bill. The defendant, by his answer here, insisted on the statute of 29 *Car.* 2, for prevention of frauds and perjuries. The lord chancellor said : " *These cases upon the statute of frauds are to be proceeded upon with great caution.* The present plaintiff does not appear to be *any relation* of the testator, and I think there is no ground on the parol evidence to decree for the plaintiff in the present case, though the cases cited go a great way. The present attempt is, in effect, to add a legacy to a will and codicil in writing by parol poof, which, if relating to *personal estate* only, ought not to be allowed ; but this goes further and seeks to *charge lands* with an annuity of 15 pounds *per annum, without writing,* which is *expressly against the statute of frauds ;* and, in the next place, to have a specific performance of an agreement not in writing, which the court will not do."

The chancellor further adds in this case : " neither is there any ground for relief on the head of accident or *fraud :* at the time of making the will, the testator talks with only one of the devisees of giving 15 pounds *per annum* more to the plaintiff, &c. ; *every breach of promise* is not to be called a *fraud,* nor does it appear that the testator was drawn in by this promise, not to add the legacy to this codicil." " Again," he adds, page 449, " demands of this kind should be pursued very recently, for the danger of perjury, intended to be prevented by the statute, increases much more after length of time, and therefore are strong objections." The lord chancellor considered the bill, in this last case, as in effect asking him to add a legacy of 15 pounds *per annum* to a will and codicil in writing upon parol proof. Was not this literally and substantially to *alter* and *change* a

[Hoge v. Hoge.]

part or *clause* in the written will or codicil? If so, it is *expressly* forbidden by the sixth section of our statute of wills, already in part recited, although not expressly so by the English statute of 29 *Car.* 2. So that our statute of 1705, on the subject of wills, is more restrictive than the English. If then, by the English act, the introduction of parol proof, in the opinion of such a man as Lord *Hardwicke*, be forbidden, what doubt can there be but that it is against both the spirit and letter of ours? No decision has ever been pronounced by our supreme court admitting parol testimony, for the purpose of *altering* or *changing* the effect of either a bequest of personal estate, or devise of real, contained in a written will, and making it different from the import of the words used therein, and I trust never will. We have a statute on the subject of wills, as also one against frauds and perjuries, of our own. Both somewhat different from the English. Our statute, especially in relation to wills, is materially variant, and more rigid against any alteration or change of a will in writing by parol proof. There is nothing in the British statute of frauds and perjuries, prohibiting the alteration of a written will of personal estate by making a nuncupative one, which is expressly forbidden by our statute of wills, and according to it, the change or alteration can only be made by a will in writing. There is no reason, therefore, why we should pay any regard to the English decisions, admitting parol proof, to create trusts of personal estate bequeathed by a will in writing. We have, it is true, followed the English decisions pretty closely, in the construction of our statute against frauds and perjuries. And it is now admitted, by every intelligent and dispassionate mind, that this statute has been evaded, and its true meaning, according to the ordinary and common acceptation of its language, in a great degree, disregarded. In truth, the real design and object of it has been defeated by a construction founded on a course of artificial reasoning, of which its framers never dreamed. Hence a disposition on the part of some of the best and soundest of our modern judges to narrow the door for the admission of parol evidence. In the case of *Iddings* v. *Iddings*, already quoted, in 7 *Serg. & Rawle*, page 115, the late Chief Justice *Tilghman* says, " for my own part, being convinced by experience of the danger of parol evidence, I am more inclined to shut the door, than to throw it wider open." Again, in *Bombay* v. *Boyer*, 14 *Serg. & Rawle* 256, he says, " I will add, that this liberty which courts of chancery have taken with statutes, in *contradicting* and almost *annihilating* their provisions, has introduced great uncertainty, and would not be carried so far, since our experience of its inconvenience, if our steps could be retraced, without shaking the foundations of property." Justice *Duncan*, in *Withers's* case, 14 *Serg. & Rawle*, says, " a departure from the wholesome provisions of the clear and positive enactments of that act, (meaning against frauds and perjuries) of which it has been said by English jurists, that every line of it deserved a subsidy, has been regretted ; and judges, instead of extend-

[Hoge v. Hoge.]

ing the exceptions, are drawing in and conforming to the statute." That the true meaning and design of the act against frauds and perjuries has been perverted, no one can well doubt. As a pretence for the introduction of parol evidence, it is said that has been done to prevent fraud, and that this was the grand object of the act. It is no doubt true, that the great design of the act was to prevent fraud; but how? Surely not by the introduction of parol proof. The fraud which was dreaded and intended to be guarded against by the very words of the act, is that which arises from receiving parol evidence, which, being given under the appearance of candour and disinterestedness, imposes conviction on the minds of the judges and juries of its truth, but in reality is false. Hence, in some of the most important concerns of life, it was deemed expedient to require, that, whatever shall be done in relation to these, should be reduced to writing, and that parol evidence should not be admitted, lest, through its falsity, fraud and injustice should be done. In short, fraud committed *by means of perjury* was the *only fraud* which the act was intended to prevent; which every one must admit cannot be effectually done, but by obeying the injunction of the act, and excluding parol evidence altogether in such cases. Now, it appears obvious, that the same motives which induced the passage of the act against frauds and perjuries, with some qualifications and exceptions, caused the enactment on the subject of wills in Pennsylvania, requiring them to be reduced to writing, in order to pass lands, &c. without any exception whatever. As yet no exception has been interpolated by any exotic construction. Will the court, then, after the regret that has been felt, and so strongly expressed for the fate of the act against frauds and perjuries, consign the act on wills to a similar one? Judges are to expound, not to make the law. We, therefore, say, that the court below erred in permitting parol evidence of what the testator, *William Hoge*, said at the time of drawing his will, to the scrivener, to be given in evidence. *Richards* v. *Dutch*, 8 *Mass.* 506; *Mann* v. *Mann*, 14 *Johns.* 14.

We also contend, for the same reasons, that the conversations and declarations of *John Hoge*, the devisee in the will, ought not to have been received. For what purpose were they offered? Was it not to give an effect to the devise made in favour of *John Hoge*, altogether different from that expressed in the body of the will itself? To make *William Hoge*, the plaintiff below, the devisee, instead of *John Hoge*, who is the person not only named therein as the devisee, and the object of the testator's bounty, but so intended to be by the testator, not only as it is written in the will, but according to the parol evidence of Mr *M'Giffin* who drew the will. For he swears that, although the testator told him at the time that it was in trust, yet he named no *cestui que trust*, and declared that he could not possibly do it in any other way; and that he had full confidence in the devisee so named. *John Hoge* then, to whom the land in dispute is given by the will, was the only person in being at the time to whom the testa-

[Hoge v. Hoge.]

tor could think of giving it.   The plaintiff was then four or five and twenty years of age, and had the testator ever thought of giving the land to him, or any interest in it, there was no plausible reason whatever why he should not have named him in his will, as the object of his regard and bounty.   He was *in being and old enough* at the time to have disclosed fully what he was, or what he was like to be.   Yet he is not named. · Nay, there is even great reason to believe that he was not even thought of by the testator.   For he was never heard to speak of him as having any regard or concern for him, much less to do any thing for him as a child, except upon one occasion that he furnished him with a horse, saddle and bridle, to get rid of the, no doubt unpleasant, importunity of *John Hoge,* the devisee, who had procured a military commission for the plaintiff, which made the above articles necessary for his equipment.   It must appear unaccountably strange if the testator could have wished or designed the devise of· the land in dispute for the benefit of the plaintiff; and yet the plaintiff not have it in his power ·to adduce a single witness who, at any time, had ever heard the testator express the slightest degree of regard for him, or say·that he intended to do any thing for him.   No such testimony was given, nor have I ever heard it suggested that any such existed.   *John Hoge,* the devisee in the will, appeared to have done the part of a parent by the plaintiff, in schooling, educating, clothing and fitting him in every respect to make a livelihood for himself in the world.   From the force of habit, if nothing else, it may be well conceived that the devisee had acquired a feeling of good will towards the plaintiff, and a desire to advance his interest in the world.   Hence arose, no doubt, the impressions made on the minds of the witnesses, to which they have testified, from loose and casual conversations with *John Hoge* the devisee.   But if the parol declarations of the testator be insufficient in law to make a will for devising lands, how is it possible that when he has made a written will giving his land to a person therein named, which is sufficient to pass the land to the devisee so named, and that the parol declarations of the testator cannot give or create a trust in it for the benefit of any other, that the parol declarations of the devisee can do more towards such an object than those of the testator himself?   Why is it that the parol declarations of the testator cannot be received for this purpose?   Because it was considered unsafe, lest, through misapprehension, perjury or any other cause, the wish and the will of the testator might be misrepresented and thwarted, in regard to the disposition of his estate: therefore it was deemed proper to require it to be put in writing, by doing of which the danger of mistake would at least be diminished.   But all these reasons prove an equal necessity for having reduced to writing any thing that may be declared, and is intended by the devisee to have an effect.

It may perhaps be contended, that as *John Hoge* appears, from the face of the will after it took effect by the death of the testator, to be the owner in fee, he had a right to declare the character in which

[Hoge v. Hoge.]

he held the estate either as trustee or otherwise.   That the statute of wills does not apply to him, but that he, upon the principle of his being owner of the land, may dispose of it by parol, by declaring that he held it in trust for the plaintiff.   This, I apprehend, would not be sufficient to constitute the plaintiff a *cestui que trust*, nor yet be sufficient evidence of his being so.   By the will I have already shown that *John Hoge* is not made a trustee, and if not made so by the will, there is nothing else appearing in the case by which the testator could have made or created him a trustee.   The simple question then is, can a man, without any *consideration*, by parol declare himself a trustee of his land for the benefit of another?   If he can, it would in effect be doing more than he could do by a deed of bargain and sale, duly executed under his hand and seal, without any consideration actually moving between him and the vendee, and without any being inserted in the deed ; because in such case the vendee would be a trustee for the vendor who would be *cestui que trust*.   I also consider it clear, from a fair interpretation of our act against frauds and perjuries, that a trust in lands cannot be created by parol, nor established by parol evidence, except in the case of a resulting trust, which arises rather from the operation of law upon the act of the party.   As when A is furnished with money by B to buy land for B, and A purchases the land but takes the conveyance of it to himself, a trust will arise or result therefrom to the use of B who furnished the money.   The consideration of the purchase in fact moved from him, and the benefit of it shall therefore return to him. But to make it a resulting trust, and take it out of the statute of frauds, it is evidently necessary that B should have advanced the purchase money, or at least some part of it, to A, at the time of the purchase.   For although A agreed to buy the land for B who agreed to advance the money, yet if A buy and pay for it with his own money, he will be entitled to hold the land, and may grant it to B or not at his pleasure.   See *Boyd* v. *Maclean*, 1 *Johns. Cha. Rep.* 582; *Botsford* v. *Burr*, 2 *Johns. Cha. Rep.* 409, where Chancellor *Kent* says, " the whole foundation of the trust is the payment of the money, and that must be *clearly proved* (which may be by parol).   If therefore the party who sets up a resulting trust made no payment, *he cannot be permitted to show, by parol proof*, that the purchase was made for his benefit, or on his account.   This would be to overturn the statute of frauds ; and so it was ruled by Lord Keeper *Henley* in the case of *Bartlett* v. *Pickersgill*, 4 *East* 577, note; *Hughs* v. *Moore*, 7 *Cranch* 176." See also *Steere* v. *Steere*, 5 *Johns. Cha. Rep.* 1 ; Justice *Duncan* to the same effect in *Peebles* v. *Reading*, 8 *Serg. & Rawle* 192; *Gregory's Lessee* v. *Setter*, 1 *Dall.* 193; *German* v. *Gabbold*, 3 *Binn.* 304, and *Wallace* v. *Duffield*, 2 *Serg. & Rawle* 421, are all cases of resulting trusts, because the purchases were considered and decided to have been made with the moneys of the plaintiffs, and therefore resulting trusts.   They are no otherwise to be considered as trusts growing out of fraud, otherwise than it was fraudulent in the

defendants to withhold from the plaintiffs the lands which they had bought with their moneys; and without the plaintiff's money has been used by the defendant in the purchase there can be no resulting trust, however unfaithful he may have been to the plaintiff. Our statute of frauds contains terms, in its first section, broad and comprehensive enough to embrace equitable as well as legal estates, and I do not see how it should have been thought otherwise, if it were not for the circumstance of being copied in part only from the English statute; omitting the seventh section among others which mentions trust estates by name. At the passage of our statute, however, as well as since, legal estates and equitable or trust estates were considered as being placed on the same footing in every respect: they were liable to dower, to the lien of judgments, and to be taken in execution and sold for the payment of debts; which last is specially provided for in the English statute, though not in ours. Nor was it deemed necessary, for the reason that we had been accustomed to treat them as if they had been of legal character. It is true that the late Chief Justice *Tilghman* (in *German* v. *Gobbald*, 3 *Binn.* 304), in speaking of the first section of our law against frauds, and the particular words of it " *by act or operation of law,*" says, " this provision seems to apply rather to legal estates than to trusts, &c." And so Justice *Duncan*, in *Peebles* v. *Reading*, 8 *Serg. & Rawle* 492, uses the following language:

" Though the act of the 21st of March 1772, for the prevention of frauds and perjuries, is copied from the statute of 29 *Car.* 2, yet it does not incorporate all the provisions of that statute. It, among others, omits the seventh section respecting trusts. This omission cannot be imputed to accident; and from the cases of *German* v. *Gobbald*, 3 *Binn.* 304; and *Wallace* v. *Duffield and wife*, 2 *Serg. & Rawle* 521, it would seem that the act did not prevent any declaration of trust being made by parol, &c., repeating the preceding declaration of the late chief justice. Yet Justice *Duncan*, after considering this matter more deliberately and maturely, declares, in *Withers's* case, 14 *Serg. & Rawle* 193: " although the seventh section of the statute of frauds, which enacts that all declarations or confessions of trust or confidence of any lands, &c., shall be manifested and proved by some writing, is not incorporated into our law, yet, in substance, it is comprehended in the first section of the act—' No interest in land, either in law or equity, shall pass by parol only, any consideration for making the agreement to the contrary notwithstanding, except for a term not exceeding three years; nor except by deed or note in writing signed by the party; or by the *act and operation of law*'—Trusts, arising by act and operation of law, are when *trust money* has been laid out in lands, or when one man pays the money, and the conveyance is to another. These, and cases fully within the same reason, are the only cases of resulting trusts by act and operation of law, which are within the exception of the act of assembly. *Wallace* v. *Duffield*,

z

[Hoge v. Hoge.]

2 *Serg. & Rawle* 521. To raise a trust by act and operation of law, an actual payment by *cestui que trust* must be shown to have been made at the time of the purchase. *Steen* v. *Steen, 5 Johns. Ch. Rep.* 1. Cases of fraud are always exceptions between the parties to the fraud." Thus we see that this learned and distinguished jurist changed his mind entirely as to the true construction of this act. If this last opinion be the true construction of the act, of which I think there can be little doubt, the parol evidence which was given of the verbal declarations of *John Hoge,* was in direct opposition to the statute. Besides, I take it to be in direct contradiction to the case of *Church* v. *Church,* 4 *Yeates* 280, where it was decided by the court unanimously, that the declarations of the grantee, made after the execution of the deed of conveyance, that she had *paid nothing for it,* but held it *in trust* for the family, were not admissible in evidence. That to receive them would militate distinctly against the act of frauds and perjuries, and that there has always been a clear and obvious distinction made between trusts of real and personal property, the latter not being considered within the English statute against frauds and perjuries. See 10 *Mod.* 404; 1 *Keble* 490.

It is alleged by the plaintiff's counsel, that it was right to admit this testimony in order to prevent fraud, and therefore it is not within the prohibition of the statute of frauds. *Lord Hardwicke,* in *Lloyd* v. *Spillet,* 2 *Atk.* 150, in speaking of resulting trusts by operation of law, and specifying two instances, says he knows of no other, " unless in cases of fraud, and when transactions have been carried on *mala fide.*" This expression is also noticed by the late Chief Justice *Tilghman* in *German* v. *Gobbald,* 3 *Binn.* 305. But the kind of fraud, or the means by which it shall be effected to produce this operation of law, and take cases out of the statute against frauds, are not explained by either. I take for granted, however, that Lord *Hardwicke* does not mean such a fraud as is attached to a mere breach of contract. For, if he did, then every parol contract for the sale of land, where the vendor afterwards, without excuse, refuses to convey, would be such a fraud as to create, by operation of law, a trust in favour of the vendee, which would be directly in the teeth of the statute. There are, however, a class of cases where frauds are practised by means of false pretences, such as men of even extraordinary sagacity cannot always guard against, which might be sufficient to raise a trust. But, according to Lord *Hardwicke,* a breach of contract does not necessarily produce fraud, in such sense of the word. In *Whitton* v. *Russell,* 1 *Atk.* 449, he says, " every *breach of promise* is not to be called a *fraud,*" and this was said too in application to the case before him, when the testator had left A 20 pounds *per annum,* by a codicil to his will, and after talking of making another codicil and leaving him 15 pounds *per annum* more, the attorney told him that if B, C and D, whom he had made devisees of his estate, would give A a bond to pay him 15 pounds *per annum* it would be sufficient; accordingly B, one of the devisees present, *promised that he and the devisees*

[Hoge v. Hoge.]

*would*—a draft was drawn, but not executed, and after the death of the testator was refused to be executed. The complainant prayed a specific performance, and to have the 15 pounds *per annum* charged upon the real estate. The lord chancellor *considered it an attempt in effect to add a legacy to a will and a codicil in writing by parol proof,* and dismissed the bill. How infinitely more strong was the claim of the plaintiff to relief, by the interposition of the court, in this case, than the one now presented to the court. *Whitton* was actually named in the will, and a legacy of 20 pounds *per annum* given to him. Whereas the plaintiff, in the case before the court, was *never even spoken of by the testator* as the object of his care or bounty.

Again, in the case of *Whitton* v. *Russell,* one of the devisees of the principal part of the testator's estate, that is the defendant, had actually promised to secure and pay the additional 15 pounds *per annum* to the plaintiff, when the testator talked of making a second codicil to his will for the very purpose of bequeathing this additional sum. Where then is there any evidence that *John Hoge* ever solicited the testator to make him devisee in his will of one third of his real estate, and to induce him to do so *promised* to hold it in trust? *Thomas M'Giffin,* the first witness, merely says that when he mentioned to *John Hoge* the disposition that his brother *William Hoge* had made of his estate, and told him that the testator said it was a trust, " *John Hoge* replied" " that is intended for young *William,*" and then adds " that he had been a long time trying to get him to do it, but he had not the courage," which seem to show that he had never obtained his, the testator's consent to give any thing to young *William.* *George Morgan* is the only one who testifies to any declaration ever having been made by *John Hoge,* that could possibly be tortured into a promise by him to the testator, who says that *John Hoge* told him " one third of the real estate was left to himself in trust for young *William Hoge;*" that this had been done by his advice, or at his instance, and *as well as he can recollect,* mentioned two reasons for this; then states the reasons, which are silly enough to be sure, and such as men of the sense of *John Hoge* or the testator could never have uttered. It is evident from *Morgan's* statement, that his recollection was very imperfect and confused. He also says that *John Hoge* told him that the testator's family pride would not permit him to do—what? To give his real estate to a bastard; as he had got it from his father and wished it to be kept not only in the family name, but in that channel, which refutes at once the idea of making the plaintiff his heir, who was *nullius filius,* and could be heir, by operation of law, to nobody; and not descended from testator's father, and, of course, out of the *channel.* This is the kind of testimony relied on to prove a promise and a fraud, and to take the case out of the statute. If such testimony is to be received, in order to set the statute aside, a *George Morgan* will never be wanting as a witness for that purpose. Again, it is said that *John Hoge* has confessed the trust, and therefore it is taken out of the statute, as the

[Hoge v. Hoge.]

danger of perjury is removed by his confession.   This is as great a
mistake, or misapplication of the meaning of such a confession, as
has ever been ruled sufficient to take a case out of the statute of
frauds and perjuries.   A confession, that must be proved by parol
testimony, has never been determined sufficient for that purpose in
any case.   But we have the confession of *John Hoge* in writing, and
given too under the solemn sanction of an oath, and after he had
divested himself completely of all interest or claim in the land.
*John Hoge* was certainly a man of the first respectability, on account
of his intelligence and integrity.   The court have his testimony on
the paper book, as also the whole of the testimony that was given
by both parties to the jury on the trial of the cause.   They will see
—unless *John Hoge* has perjured himself, which no disinterested
man, that was acquainted with Mr *Hoge* in his lifetime, would dare
to say—the injurious effect of admitting parol evidence in such cases.
Only let a jury have the name of testimony before them when a
particular feeling and excitement are got up in favour of one of the
litigant parties, and no matter whether the testimony has any bear-
ing in his favour or not, *feeling* will give him a verdict.   It is also
contended by the plaintiff in error that no consideration was shown,
nor did any exist to raise and support a trust in favour of the plain-
tiff below.   Inasmuch as *John Hoge* is the person, and the only one,
named in the will as the devisee of the land in dispute, or for whose
use and benefit it was intended, no averment can be made that it
was intended for the use and benefit of any other.   The rule laid
down on this point is, *that every* devise implies a consideration in
itself, and no averment can be made that it is for the use of any
other than the devisee named in the will.   *Vernon's Case*, 4 *Co.* 4 a ;
1 *Cruise's Dig.* 206, sec. 447, 55 ; 5 *Cruise's Dig.* 9, sec. 18, 19 ; 2
*Woodeson* 363.

So if a man, by his will in writing, devise land to his wife, in hope
that she will leave it to his son, this shall be no trust for the son.
1 *Cha. Ca.* 310 ; 2 *Comyn's Dig., Day's ed., tit. Chancery, Trust*, 4
w, p. 4, in the margin 800.

When an agreement is purely voluntary, not supported by a valu-
able or meritorious consideration, equity will not enforce the execu-
tion of it.   *Newland on Cont.* 79 ; *Colman* v. *Sorrel*, 1 *Ves.* 50 ; *S. C.*
3 *Bro. Cha.* 12, 12 *Ves.* 46.   It cannot be pretended that there is
any valuable consideration in the case before the court.   Nor is there
any relationship between the testator and the plaintiff below, or be-
tween him and *John Hoge*, that will raise a good or meritorious con-
sideration.   The plaintiff below must be considered as a mere
stranger to them both.   A court of equity will not enforce a volun-
tary agreement in favour of an illegitimate child, for it is considered
as a mere volunteer : although the parent is bound in morality and
law to support such child, yet a court of equity, following the rule
of law that a bastard is *nullius filius*, considers him in the light of a
mere stranger.   *Newland on Cont.* 69, 70.   Thus it seems that the

[Hoge v. Hoge.]

law not only considers the plaintiff below as a stranger to the testator, but the testator himself even considered him so. His name was not mentioned to the writer of the will, nor to any body else that we have heard of. The land in dispute is given expressly to *John Hoge* by the testator, who at the time declared to the scrivener *that he had no other way of doing it,* repeating this declaration twice over. Whereas if he had intended any benefit to the plaintiff, he could not have said so. The declaration of the testator is, I think, very satisfactorily explained and accounted for by *John Hoge* in his deposition.

Mr *Ewing's* argument goes on the ground that *John Hoge* was a trustee. He assumes the fact in dispute, and all his authorities are predicated upon it. He says that *John Hoge* confessed the trust—if so, I should suppose *Hoge's* whole confession must be taken together, and that clearly shows that plaintiff below had no claim. The statement of *John Hoge* is clear and susceptible of a rational construction and interpretation; give it that, and the plaintiff below can have no claim. Again, he says, that the verdict of the jury assumes that *John Hoge* is perjured. *Hoge* had no agency in bringing about the compromise. It was not shown that he had interfered in any way; the question was, trust or no trust *for William Hoge?* and that was the matter compromised. The settlement, to say the least of it, was not of an acknowledged claim, but of one admitting of great doubt; a purchase of peace, on the part of the defendant below; for which he pays the land in Mercer county? Why talk of inadequacy of price, when no evidence was given on that subject, and the question was not made in the court below? This case shows the ease with which the minds of jurors are occasionally led to sacrifice *justice* to *feeling.* Can an instance be shown of a compromise fairly made, as this one was, and carried into execution, being afterwards set aside? The land was received and sold by young *William Hoge,* and the money received by him, and he lies by seven years, until the death of the principal witnesses against him, before he appeals to the popular and levelling feelings of a jury, with whom *John Hoge's* and old *William Hoge's* ideas about family names and estates would not go down. To show that a gratuitous promise will not support a bill in equity, any more than it will an action at law, I refer to 3 *P. Wms* 131, 317; 1 *Vernon* 12; 1 *Ves.* 507; 7 *Johns.* 207, 322; 10 *Johns.* 241, 594.

I consider the three first errors assigned fully noticed and established, and will come to the fourth.

What is and ought to be considered a reasonable time, within which a person, who pretends to have such a claim as the plaintiff below, ought to prosecute and assert his right to it? "It is a maxim as well of equity as of law, *leges subserviunt vigilantibus et non dormientibus,*" says Justice *Duncan,* in *Peebles* v. *Reading,* 8 *Serg. & Rawle* 494. "It is on this principle, that an unexecuted location, description, or even warrant, with money paid, loses its priority after a delay in executing the contract by survey of much shorter continuance than

[Hoge v. Hoge.]

was in this case" [which was something less than fourteen years]. "The claimant, in opposition to the legal title, should not delay asserting his right, as a stale claim will meet with little attention." See *Sugden* 415, who says, "unless the trust arise on the face of the deed itself, the *proofs must be very clear;* and however clear they may be, it seems doubtful whether *parol evidence is admissible against the answer of the trustee denying the trust.* And in cases of this nature, the *claimant in opposition to the legal title,* should not delay asserting his right, as a *stale claim* will meet with little attention." See also *Delane* v. *Delane, 4 Bro. Par. Ca.* 258, where a clear case of a resulting trust was made out in favour of the complainant, who had delayed commencing his suit seventeen years, but was a minor, and abroad at the time the right descended to him from his ancestor. His bill, however, was dismissed on account of his delay to assert his right earlier.

The utmost limitation allowed for commencing a suit for such claims in Pennsylvania, I apprehend, has been seven years. As often as the legislature have turned their attention to such cases, that appears to be the time which they have allowed. Indeed, in 1705, the legislature passed an act for the purpose of securing to, and confirming to persons who had been in the possession of lands seven years under an *equitable* right, *an unquestionable title* to the same against all. Thus postponing and setting aside legal titles to lands in favour of those who had held an adverse possession of them under equitable titles. *Purdon's Dig.* 530. So in the fifth section of the act of the 26th March 1785, *Purdon's Dig.* 532, it is provided that "no person or persons that now hath or have any claim to the possession of any lands, tenements or hereditaments, or the preemption thereof from the commonwealth, founded upon any prior warrant, whereon no survey has been made, or in consequence of any prior settlement, improvement or occupation, without other title, shall hereafter enter, or bring any action for the recovery thereof, unless he, she or they, or his, her or their ancestors or predecessors have had the quiet and peaceable possession of the same *within seven years next before* such entry or bringing such action." The will of the testator, it will be observed, was proved on the 9th of November 1814. A suit was commenced in April 1820, compromised and discontinued the 29th of August in the same year. From this time, when it was believed by every body that the claim of the plaintiff below was finally settled and put to rest for ever, he lies by until the 27th of October 1827, a space of seven years and three months. Is it not for the interest of the community that claims, such as the plaintiff below pretends to have in this case, which are to be established by parol evidence, in direct opposition to every thing that has been committed to writing on the subject, as also the regular muniments of title to the land in dispute, should be prosecuted with vigilance, and not suffered to slumber until witnesses who might be all important for the party in possession under the legal title are dead? That

was really the case with respect to the defendants below in the present case. *John Hoge* and *Parker Campbell*, Esquires, both very important witnesses for the defendants, had they been living, in the mean time, had died. This circumstance, no doubt, had its weight with the plaintiff for bringing this his second suit. If the statute of wills, as well as the statute against frauds and perjuries, is to be prostrated, to make way for such claims, and the party to be indulged until he may think a suitable time has come round for asserting his claim, the owners of real estates will hold them by a very brittle tenure indeed. We claim that the court below ought, therefore, to have charged the jury, as matter of law, that the plaintiff was barred of his claim by lapse of time.

As to the fifth error assigned. I must here repeat that the paper book contains all the evidence given on the trial below by either side. The plaintiff, as it appeared from evidence, had no evidence on the trial of this case that he had not before the arbitrators in the former action, except *Jacob Henry*, who certainly did not improve his case any. Why then did the court talk of the defendant's *taking any undue advantage of the plaintiff's ignorance* in making the compromise? The court could not, I presume, have meant ignorance of *the facts*, because the defendant in the mean time had got no new testimony whatever. He was as well informed of the matters of fact at the time of compromise, as at the time of commencing, or even trial of the cause, and so the court ought to have told the jury, as they undertook to speak of ignorance; otherwise, it was calculated to mislead the jury as to the testimony of the facts. If, however, the court meant *ignorance of the law*, then there was error in this, for I take it to be well established, that *ignorance of the law*, if the party be acquainted with the facts, forms no ground for relief, even in equity. He shall be bound by his contract. Every man, says Chancellor *Kent*, is to be charged, at his peril, with a knowledge of the law. 2 *Johns. Cha. Rep.* 60; 1 *Ibid.* 516. Indeed I consider it a maxim in both civil and criminal jurisprudence : *ignorantia juris non excusat.* *Doug. Rep.* 471; *Bilbie* v. *Lumley et al.*, 2 *East* 469. In the *Doctor and Student*, a book of high authority, it is said, page 79, " ignorance of the deed may excuse, but ignorance of the law excuseth not." See also *Chitty on Bills* 250 ; *Brown* v. *Armstead*, 6 *Rand.* 601.

The case of *Millikin* v. *Brown*, 1 *Rawle* 398, involved this very principle, and the decision of the court confirms the truth of it. It is there conceded by his honour Judge *Huston*, who delivered the opinion of the court, that *Millikin*, in giving the receipt to *John Watson* for his part of a judgment which *Millikin* had against *Watson* jointly with *John* and *William Brown, Jun.*, had no intention of releasing the *Browns*, and that he never even suspected it could have any such effect ; yet, inasmuch as he was bound to know the law, the court decided that he must abide by the legal consequence of his act. So in *Richter* v. *Selin*, 8 *Serg. & Rawle* 438, where the

indorser of a negotiable note to whom notice of a demand on the drawer had been given, and he *having a knowledge of the facts*, promised payment of the amount thereof, it was held that he was bound by his promise, and that *ignorance of the law* would not excuse him.

The sixth error. We say that our ninth point was not answered by the court below, or if answered at all, it was done in connexion with a reference to facts and circumstances, of which not a tittle of evidence was given to the court and jury. This point was a request to the court to charge the jury "that unless fraud had been proved to have been practised by *David Hoge* upon the plaintiff in making the compromise, it was good and binding upon him, and barred him of his action." The court below, instead of answering this point, and directing the jury in regard to it separately and distinctly, blend it with the second, third, fourth, fifth and sixth points made by the plaintiff and the eleventh of the defendant, thus rendering it difficult if not impracticable for the jury to collect any separate and precise answer from the court to the defendant's ninth point. But, what is still worse, the court, in what they give as an answer on this subject, assume facts and circumstances which were not in proof, but rather indeed expressly negatived by the evidence on the trial. These facts, and the circumstances of which we complain are "the agency or interference of *John Hoge* being employed to effect the arrangement" (compromise); "the embarrassed situation of the plaintiff to drive an unconscionable bargain, contrary to justice and fairness;" "gross inadequacy of price, connected with other circumstances of overreaching." The court have all the evidence before them that was given below by either party, and I am entirely at a loss to see *in* what part *it is* that any of these things are proved, or even testified to. Nothing of the kind appears. Was it not then the duty of the court below, upon every principle of fairness and justice, instead of addressing the jury as if they had had evidence given to them from which they might fairly infer and find all these matters and facts to be true, to have told them that nothing of the kind appeared in the evidence, and that they could and ought not to presume them to be so? For instance where is there a word of inadequacy of price in the evidence? Not a syllable. Or of *David Hoge's* employing *John Hoge* as his agent to effect a compromise, or for any other purpose; of the plaintiff's necessitous or embarrassed situation, or *circumstances of overreaching?* Does it not, on the contrary, appear, that the compromise was made and entered into by the plaintiff, with the advice of his counsel, after a full hearing of all the testimony, and of course a full knowledge of the facts and circumstances, without the least influence being used or attempted by *John Hoge, David Hoge,* his counsel, or the arbitrators? It does not appear that the compromise was ever sought for by *David Hoge,* his counsel, or any other on his behalf; but was entered into freely by the plaintiff below under the advice and direction of his own counsel, without even the influence of embarrassment or necessity on his part, from any thing that appears. For

[Hoge v. Hoge.]

we may suppose his necessity was not very pressing, when, by the terms of the arrangement, it was put into his own power to obtain a deed of conveyance from Mr *David Hoge* for the four hundred acres in Mercer county. He had first to make a selection of it, and then *David Hoge* was ready to execute the deed, yet he did not ask for it for more than a year afterwards, when, still *perfectly satisfied with the compromise,* he accepted a deed from *David Hoge* in confirmation of it, and not until after that again did he sell it. I confess it appears to me to have been cruel to leave it to the jury in the manner in which it was left, by such observations as the court made.

As to the validity of the compromise independently of fraud, no rational doubt can I apprehend be entertained. All the authorities cited on the other side as to the law and principles which obtain between trustee and *cestui que trust,* and the grounds upon which courts of equity have interfered to grant relief against the effect of contracts made between them, and of setting aside overreaching bargains made with young and extravagant heirs apparent, or persons under embarrassed circumstances, &c., may be admitted to have been correct, but surely they have no application to the present case. In all, the relation of trustee and *cestui que trust* was admitted to exist. So in the cases of purchases for inadequate prices, the rights of the sellers to the estates at the time of sale were clear of all dispute and admitted to be in the sellers, and therefore inadequacy of price with other circumstances might be evidence of fraud, as overreaching, on the part of the purchasers. But in the present case, the fact whether *John Hoge* or *David Hoge* was a trustee for the plaintiff below, and he had a right or claim to the estate as the *cestui que trust,* was the very point in issue between the parties. Was there any ground for questioning the plaintiff's right? No intelligent and disinterested person, judging from the evidence that was given to the jury, will even now say that the plaintiff has made his right to the property in dispute manifest in any point of view whatever, either *in fact or law.* It is perfectly idle then to speak of this transaction as one in which the trustee got a conveyance from the *cestui que trust* of his right. It was in truth a compromise of a real subsisting dispute and controverted right between the parties. If so, it is no objection then to the agreement of compromise that the party, supposing him to have had the better right, gave it up for comparatively a trifling consideration, had he held it free and clear of all dispute. Lord *Macclesfield* lays it down, that an agreement entered into upon a *supposition* of right, or a doubtful right, though it afterwards comes out that the right was on the other side, shall be binding, and the right shall not prevail against the agreement. In *Cann* v. *Cann,* 1 *P. Wms* 727, his words are: "that when two parties are contending in this court, and one releases his pretensions to the other, there can be *no colour* to set this release aside, because the man that made it had a right; for, by the same reason, there can be no such thing as compromising a suit, nor room for any accom-

2 A

[Hoge v. Hoge.]

modation; every release supposes the party making it to have a right; but this can be no reason for its being set aside; for then every release might be avoided." 1 *Atk.* 10; *Cavode* v. *M'Kelvey, Addison* 56; *Newl. on Cont.* 78; *Perkins* v. *Gray,* 3 *Serg. & Rawle* 331, 332.

We contend that the court therefore erred greatly, in the manner in which they submitted the evidence and effect of this compromise to the jury. That they ought to have told the jury, in so many words, that the agreement of compromise was most binding on the plaintiff below, and barred his recovery, unless indeed it was infected with fraud, 'of which there was not the slightest evidence, and they could not presume it. If such a case had been submitted to a chancellor, what would he have said? Can any one doubt?

The *seventh,* and last error which I shall notice, raises the question, whether, supposing the agreement of compromise not to be binding upon the plaintiff, and him to have made out his case, in all other points, to the satisfaction of the court and jury, he ought not, before bringing his action, to have made and tendered to *David Hoge* a deed of reconveyance for the land in Mercer county? Here, it must be observed, that the legal title to the land in dispute is in the defendants, and that the plaintiff claims to recover upon sheer equitable principles. What does equity require that he should do, before he shall demand of the defendant to surrender to him the possession of the land in dispute? Does it not require, at least, that he should restore to *David Hoge* the property which he has taken from him? Upon what principle is it that a plaintiff claims to recover the possession of land in ejectment upon principles purely equitable, in opposition to the legal title? Is it not upon the principle that, at the time of bringing his action of ejectment, he is entitled, in equity and good conscience, to be invested also with the legal title; that he has a right in equity to demand that it shall be made to him; and that if the party who has the legal title had done what in equity he ought to have done, he would have conveyed the legal title to him who has the equitable? But not having done so, equity will consider that as already done, which ought to have been done; and, upon the idea of this imputed title it is, that the party having the equitable title *in fact* only, is enabled to sustain and recover in his action of ejectment. In a court of law, if the plaintiff be entitled to recover in any form of action where damages may be recovered, he will be entitled to recover costs as a matter of course, unless it be regulated otherwise by statute. In courts of equity it is otherwise; the chancellor can exercise his discretion about giving or not giving costs. Hence it is necessary that a party who comes into a court of common law to enforce an equitable claim, must do equity, and every thing that equity requires of him to be done, before he shall commence his suit, so that, consistently with the principles of equity, he may be entitled to recover the costs also of his suit. This matter is very clearly and satisfactorily explained by his honour the present

[Hoge v. Hoge.]

chief justice, who delivered the opinion of the court in the case of *Snyder* v. *Wolfley*, 8 *Serg. & Rawle* 332, who says, "when the plaintiff has a title to recover at law, and the defendant has an equitable claim which ought to be first satisfied, it has been held that a tender at the time of trial is sufficient ; or perhaps the jury might find a conditional verdict ; but when the action is in place of a bill in chancery, and the plaintiff's title is incomplete in equity, the rule is different." Now it seems to be admitted by the plaintiff's counsel, that his title to the land is incomplete, in equity, until he shall reconvey the Mercer county land, or at least make compensation for it. And even if he did not admit it, could any body doubt of it ? And in that case it was decided, that an action could not be maintained to recover the prize drawn to a lottery ticket which has been lost, without, previously to the commencement of the suit, giving or tendering an indemnity against future claims founded upon it, inasmuch as by its terms the prize was made payable to the bearer. So in the case of *Chahoon et al.* v. *Hollenback*, 16 *Serg. & Rawle* 433, it was held, that " when the plaintiff relies on an equitable title, the tender must precede the action." Besides, take the common case of a man who is cheated in the purchase of a horse or other article, for which the purchaser has paid to the seller 100 dollars as the price, by the suppression of the truth or suggestion of a falsehood on the sale. He wishes to have a return of his money again ; and to bring for that purpose an action for money had and received. This action, no doubt, may be maintained on the ground that the contract is void for the fraud ; but, if the buyer of the horse wishes to avoid the contract, and thereby get his money again, what must he do before he brings his action ? Surely, he must offer at least to return the horse. *Norton* v. *Young*, 3 *Greenleaf's Rep.* 30 ; *Kimball* v. *Cunningham*, 4 *Mass.* 502 ; *Conner* v. *Henderson*, 15 *Mass.* 319 ; *Young* v. *Adams*, 6 *Mass.* 182 ; *M'Nevin* v. *Livingston*, 17 *Johns.* 437; *Hunt* v. *Silk*, 5 *East* 452 ; *Lawrence* v. *Dale*, 3 *Johns. Cha. Rep.* 42.

It does appear that the court below were manifestly wrong, in their charge to the jury on this head ; and I, therefore, submit the case without further argument.

*N. Ewing*, for defendant in error.

The only material question in this cause is, whether the court below erred in admitting parol evidence to establish a trust in *John Hoge ?* The other exceptions are either not supported in fact, or have nothing in them. The question then is, does the statute of frauds of Pennsylvania prohibit a parol declaration of trust ? Unless a distinction can be taken between estates created by deed, and those created by will, the point appears to me as well settled as any other in Pennsylvania. It is said by Chief Justice *Gibson* in the case of *A. Hampton, Guardian*, 17 *Serg. & Rawle* 148, " that *to prove a trust, is one of those cases in which parol evidence is admissible,*" and Chief Justice *Tilghman*, in the *Lessee of German* v. *Gobbald*, 3 *Binn.* 304, says that

[Hoge v. Hoge.] .

the provision of our statute " *seems to apply rather to legal estates than trusts*," and notices that the English legislature so considered it, as *they added a provision with respect to trusts in the seventh and eighth sections of their statute which is entirely omitted in our act of assembly.* If this be so, the question is at an end, and the cases of *Thompson* v. *White*, 1 *Dall.* 424; and *Wallace* v. *Duffield*, 2 *Serg. & Rawle* 521, appear to establish this position. In the latter case Justice *Gibson* declares expressly, that it is *not a resulting trust ;* and Chief Justice *Tilghman*, in page 526, says, *a trust might not result by operation of law*, but considers the investment of the testator's money strengthened by *the declarations* of the executors, sufficient to prove an express trust, and in page 527, he approved of the charge of the court below to the jury, that the law would *not raise a trust*, unless an *intention* to create it was *proved by parol* or other declarations; and Justice *Yeates*, in page 528, says, "the question of fact was submitted to the jury whether an *express* trust was not proved," and approves of the above cited part of the charge of the court below. The case of *Thompson* v. *White*, to which I shall have occasion again to call the particular attention of the court, appears to be recognized and approved by Justice *Huston* in the case of *Thompson* v. *M'Canahan*, 17 *Serg. & Rawle* 112 and 113; after stating the facts of the case, he says, " proof was admitted that these conveyances, though on the face of them absolute, were, in fact, in trust ; *what that trust was*, and *for whom*, was *made out by parol.*" In the case of *Peebles* v. *Reading*, 8 *Serg. & Rawle* 484, the broad and naked question is presented and decided, that our statute *does not prevent a declaration of trust by parol.* Justice *Duncan*, who delivers the opinion of the court, says, in page 492, " this is not a resulting trust;" and this is one of the strongest possible cases: a purchaser at sheriff's sale, who paid his own money, and took possession of the property purchased, was by *parol proof* alone made a trustee for the *defendant* in the execution. In this case Justice *Duncan* also notices the important variance in our act from the English statute, in omitting the seventh section of the latter respecting trusts, and he adds, *this omission cannot be imputed to accident.* But were it necessary, it would be no difficult task to show that in the case before the court parol evidence is admissible, even under the English statute, and I would here call the attention of the court to some part of the evidence, which assimilates this case to the case of *Thompson* v. *White*, as well as takes it out of the operation of the English statute. By the testimony of *George Morgan*, it appears that *John Hoge* confessed that the property in dispute was left to him in trust for the plaintiff; *that this was done by his advice, or at his instance;* and by the testimony of Mr *M'Giffin*. It appears that when the testator spoke of the difficulty of making provision for the plaintiff, *John Hoge* suggested to his brother *to give it to him.* In the case of *Reech* v. *Kennegal*, 1 *Ves. Sen.* 123, at page 125 the lord chancellor says, " the court has adhered to this principle, that the statute *should never be understood to*

[Hoge v. Hoge.]

*protect fraud,* and therefore wherever a case *is infected with fraud,* the court will not suffer the statute to protect it *so as that any one should run away with a benefit not intended.*" See same case (*Reech* v. *Kennigate*), *Ambler* 67. In page 68, it is said, the statute was not designed to protect frauds; and in *Hutchins* v. *Lee,* 1 *Atk.* 447, where an absolute assignment was decreed a trust, upon *parol evidence,* it is said that *parol evidence is admissible in evidence of fraud;* and Chief Justice *M'Kean,* in 1 *Dall.* 427, says, " the statute and act of assembly were made to prevent *frauds* as well as perjuries; they should be construed liberally, and beneficially expounded, for the suppression of cheats and wrongs." In page 428, he says, " here was a breach of trust in *Lawrence Salter,* a *fraud in law,* which is not within the act. This *is the reason of our judgment.*" In cases of fraud, and where transactions have been carried on *mala fide,* there is a resulting trust by operation of *law; Lloyd* v. *Spillet,* 2 *Atk.* 150. *Per Duncan,* Justice, in *Peebles* v. *Reading,* 8 *Serg. & Rawle* 492; and *per Tilghman,* in *Lessee of German* v. *Gobbald,* 3 *Binn.* 305. Now trusts resulting by operation of law are expressly excepted out of the English statute by the eighth section. In *Thompson* v. *White,* the only fraud of which *Lawrence Salter* was guilty, was his neglecting to perform the promise or undertaking which induced his wife to vest the title to the property in dispute in him. This breach of trust is considered a fraud in law, a fraud on the person creating the trust or reposing the confidence. This is the principle upon which many of the cases there cited, turn. The cases of *Thynn* v. *Thynn,* 1 *Vern.* 296; *Eq. Ca. Abr.* 380, pl. 6; *Reech* v. *Kennegal,* 1 *Ves. Sen.* 123, *Abr.* 67; and *Drakeford* v. *Wilks et al.,* to which the particular attention of the court is called, are all cases of wills; as are also the cases of *Kingsman* v. *Kingsman,* 2 *Vern.* 559, and *Devenish* v. *Baines, Prec. Cha.* 3: so that it cannot be said the cases of wills can be distinguished from those of deeds; and in many of the foregoing cases the facts are precisely similar to those of the present case. The defendants obtained the interests which they attempted to hold, at their own solicitation, and by promising to hold as trustees for others. *Here John Hoge solicits and prevails on his brother to give him the property, by promising to be a trustee for the plaintiff.* Shall he then be permitted to shelter himself under the statute? Shall the statute be construed to protect and sanction such monstrous fraud and iniquity? Where it is agreed that the terms of a contract shall be reduced to writing, which is prevented by the fraud of one party, the contract will be established; and why? Because a statute made to protect against frauds shall not be made the instrument of fraud.

To prove that the provisions in wills are liable to be affected by parol evidence as well as those of deeds, I refer the court to the late case of *Baily* v. *Herkes,* 1 *Penns. Rep.* 126.

The second error assigned, I consider disposed of with the first.

After establishing the doctrine contended for in considering the first exception, the only question remaining in the third exception is,

whether a trust may be declared to a bastard. Upon this question I presume there can be no difficulty; for though bastards are not considered as children for whom a consideration of blood will raise an use, when the *possession remains* in the party creating the use or trust; yet where the *estate is actually passed to a third person*, where there is a transmutation of possession, a use may be as well declared to a bastard, *being in esse* and sufficiently described, as to any other person. See *Hargrave's Note* 8, to *Co. Litt.* 123, a.; *Fonbl. Eq.* 124, n. (*Am. Ed.* 1820).

To the fourth exception we reply, that twenty years, by analogy to the statute of limitations, is the period allowed by chancery for commencing proceedings to set aside conveyances of real estate on the ground of fraud. See *Wallace* v. *Duffield*, 2 *Serg. & Rawle* 521; *Morse* v. *Royal*, 12 *Ves.* 374, 377; 4 *Desaus.* 706. In the fifth exception there is nothing; the answer of the court is sufficiently explicit; and particularly when taken in connexion with the other parts of the charge, is by no means vague and ambiguous, and I contend that it is too favourable to the defendant. The court will observe that *David Hoge* takes as a volunteer from *John Hoge*, and of course as a trustee, as *John Hoge* was. *Macreth* v. *Symmons*, 15 *Ves. Jun.* 329, 336, 350; 1 *Scho. & Lefr.* 262; *Talb.* 261; 2 *P. Wms* 681. It will also be observed that the conveyance of *John Hoge* to *David* was made *five days before* the release of the plaintiff to *David*. During that period then, he stands precisely as *John Hoge* stood. Now it may well be questioned, whether a court of chancery would, under any circumstances, sanction the purchase of the trustee from the *cestui que trust:* and most certainly it would not, when, at the moment of the purchase, the trustee was denying and controverting the title of his *cestui que trust.* See *Church* v. *Marine Ins. Co.*, 1 *Mason* 341; *Clement* v. *Peters, Coxe's Dig. U. S. Rep.* 726, pl. 38; *Munroe* v. *Allaire*, 2 *Caines's Cas. in Er.* 183. A release by *cestui que trust* to trustee cannot vest any beneficial interest in the trustee. *Per Tilghman* and *Yeates,* in *Newlin* v. *Newlin*, 1 *Serg. & Rawle* 279, 280; and per *Bradford,* Judge, in *Bixler and wife* v. *Kunkle's Executors*, 17 *Serg. & Rawle* 304; and by *Todd,* Judge, in the same case, 308, 310. And although some of the cases do not make a purchase by the trustee from the *cestui que trust, absolutely* void if *fairly* and *openly* made; yet even these cases say that it is looked upon with the greatest jealousy, and that there must not be the least tincture of fraud or inadequacy; and before a trustee can deal with his *cestui que trust*, the relation must in some way be dissolved; or if not, the parties must be put so much at arm's length that they agree to take the character of purchaser and vendor, and all the duties of those characters must be performed. *Davis* v. *Laing*, 2 *Johns. Cha. Rep.* 259, 257, 260; 6 *Ves.* 277; 2 *Bro.* 427, note.

In examining this case the court will bear in mind, that it is established by the verdict of the jury, that *John Hoge,* the original trustee, was perjured in the testimony he gave in the cause. Here

[Hoge v. Hoge.]

then is a trustee, after suit brought against him for the trust property, *conveying to his brother,* and presenting himself as a witness, and *by perjury* denying the trust, and thus inducing the *cestui que trust* to convey to the trustee. *The jury have further established David Hoge's privity to all this.* But for argument sake, suppose him innocent ; can he hold the property thus iniquitously acquired ? Interests obtained through the fraud of another person cannot be maintained by third persons, although not themselves parties to the imposition. *Huguenin* v. *Baseley,* 14 *Ves. Jun.* 288 ; *Bridgeman* v. *Green,* 2 *Ves. Sen.* 627, *S. C. Wilm.* 64. See *Inhabitants of Worcester* v. *Eaton,* 13 *Mass.* 376. The person receiving property " *must take it tainted and infected with the undue influence and imposition of the person procuring the gift.*" " *Let the hand receiving it be ever so chaste, yet if it comes through a polluted channel, the obligation of restitution will follow.*" *Per Wilmot,* in *Bridgeman* v. *Green, Wilm.* 64, cited with approbation by Lord *Eldon,* in *Huguenin* v. *Baseley,* 14 *Ves. Jun.* 289. Fraud vitiates an agreement, and a *principal, though innocent of the fraud,* cannot avail himself of such fraudulent agreement made by his agent. *Owens* v. *Whitaker, Hughes's (Kent.) Rep.* 71 ; *Taylour* v. *Rochford,* 2 *Ves. Sen.* 281. Now, in the case before the court, it must be taken as established, that *John Hoge* acted as the agent of *David Hoge,* and that the release was procured through his instrumentality, by his imposition and false representations. The court will recollect that here is a property valued by *John Hoge,* the trustee, at 15,000 dollars, released by the *cestui que trust to his trustee* for 940 dollars, or property of that value. Ought not the court below to have instructed the jury that this *gross inadequacy,* connected with the *situation, circumstances,* and *relation* of the parties, was such *strong, overwhelming* and *conclusive* evidence of fraud, imposition and oppression, as to invalidate the whole transaction. In the case of *Butler* v. *Haskell,* 4 *Desaussure* 651 ; where one fourth was paid : the chancellor, at page 687, says, " the courts have said, that the inadequacy may be so gross as to furnish strong and *even conclusive* presumption of fraud, and that *in this way, the grossness of the inadequacy may avoid the sale;*" and he proceeds, " in comparing the inadequacy existing in the case under consideration with the degrees of inadequacy existing in the decided cases, it seems to come completely within that degree of gross inadequacy which furnished the presumption, and *vitiated the contracts.*" In our case the inadequacy is nearly four times greater than that which Chancellor *Desaussure* held to come within the decided cases and to vitiate a sale. Instead of receiving one-fourth of the value of the property sold, the plaintiff received but *a fraction over a sixteenth.* In the case of *Baugh* v. *Price,* 1 *Wils.* 320, the inadequacy did did not amount to one half. To this and the other cases cited in the above mentioned case of *Butler* v. *Haskell,* I particularly refer the court, not only as establishing the principle now under consideration, but to prove that the compromise of the original suit

[Hoge v. Hoge.]

does not place the defendant on better ground than he originally occupied. In the case of *Butler* v. *Haskell*, at p. 697, the chancellor concludes thus : " I consider the result of the great body of the cases to be, that wherever the court perceives that a sale of property has been made at a grossly inadequate price, such as would shock a correct mind, this inadequacy furnishes a strong and in general a *conclusive presumption* (though there be no direct proof of fraud) that an undue advantage has been taken of the ignorance, the weakness, or the distress or necessity of the vendor."

In the case of *Bowes* v. *Heaps*, 3 *Ves. & B.* 119, where it was not imputed to the defendants that they *used any endeavours* to induce the plaintiff to enter into the transaction, *but merely acceded* to the proposal that was made them ; the master of the rolls declared, that it was not every bargain which distress may induce one man to offer, that another is at liberty to accept. The *mere absence* of fraud does not necessarily decide the validity of the transaction, as *is proved by* many cases, from *Berney* v. *Pitt*, 2 *Cha. Rep.* 396, 2 *Vern.* 14, down to *Gwynne* v. *Heaton*, 1 *Bro. Cha. Rep.* 1. In the latter case, Lord *Thurlow* says, the defendant is not charged with misleading the plaintiff's judgment, or tampering with his poverty. In that case too, as in this, the *bargain had been hawked about* and *offered to many persons.* That, Lord *Thurlow* says, *only shows the distress of the borrower.* In the case of *Chesterfield* v. *Janssen*, 2 *Ves. Sen.* 125, 1 *Atk.* 301, where the defendant loaned 5000 pounds, to be repaid 10,000 pounds, *only* on the contingency of the borrower surviving his grandmother. The borrower, *John Spencer*, was about thirty years of age, impaired in constitution ; his grandmother seventy-eight, of good constitution, and careful of her health. He sent the proposal to market. *It was rejected by several knowing ones, and at first by the defendant,* but afterwards accepted by him. The grandmother lived six years and three months, and *Spencer* survived her one year and eight months. At the time of this transaction, *John Spencer* possessed *an income of* 7000 pounds *per annum*, and a *personal estate of great value.* Had the case stood on its original ground, as here stated, the court would have set aside the transaction. It was sustained only on the ground of the deliberate confirmation by *John Spencer*, and the renewal of his bond after the death of his grandmother. In the above cited case of *Gwynne* v. *Heaton*, 1 *Bro. Cha. Rep.* 1, the grant of a reversionary rent-charge, after the death of plaintiff's father, who was old and infirm, upon unreasonable terms, was set aside ; though it was contended for the defendant, that he was not a dealer in such transactions, and was *invited into the bargain, and the terms deliberately settled by the plaintiff and his friends;* the same terms having been offered to other persons ; also that *Gwynne* was not an expensive young man dependent on his father ; that there was a contingency too, by which defendant might have lost all his advances, and that the disproportion was not enormous ; for if the father had lived seven years, there could not have

[Hoge v. Hoge.]

been any pretence of such inequality as the court would relieve against. So that it was reduced to the single question, whether this agreement was upon such an inadequate consideration that *this court will set it aside on that ground alone,* there being *no pretence of imposition.* But *all these reasons were urged in vain,* as it appeared that the consideration was grossly inadequate, being, as was stated, *three or four for one.* The lord chancellor said, *the ground for relief was gross inequality*—that the *charges of fraud and oppression were not proved*—that the vendor made the offer to the purchaser, who *accepted it in the very shape it was offered,* and did not labour to lower the terms. *There was no confidence* subsisting between the seller and the buyer; *there was no misleading of the judgment* of the vendor, nor tampering with his poverty. The chancellor there reviews the decided cases, and shows that inadequacy alone cannot, as *mere inadequacy,* be made a ground for setting aside a contract, yet it was, when very gross, a *mask of fraud,* and, *in that way, would operate to vitiate the bargain.* In *Butler v. Haskell,* 4 *Desaussure* 687, 688, the chancellor says, "there is a distinction made between the case of young heirs selling expectancies, and of others, which I am not disposed to support. It is said that the former are watched with more jealousy, and more easily set aside than others, on principles of public policy. This was certainly true at first; but the eminent men who have sat in chancery have gradually applied the great principles of equity, on which relief is granted to *every case where the dexterity of intelligent men* had obtained bargains at *enormous and unconscientious disproportion,* from the ignorance, the weakness or the necessity of others, whether *young heirs or not.*"

In the case before the court, the pendency of the former suit and the discontinuance of it, at the time and in consequence of the compromise, cannot take it out of the general rule. It is all *one transaction,* done all at the *same time.* There is no *subsequent, distinct* and *independent* act of confirmation. The release and discontinuance of the suit were one transaction; and nothing is done subsequently but in pursuance of the original stipulation. But had the release been *first* given, and the suit *afterwards* instituted to annul it, and then discontinued, from any consideration whatever, except a fair and adequate price, we are not without authority to show that the plaintiff would still be at liberty to assert his original rights. See 4 *Desauss.* 715. In the case of *Taylour v. Rochford,* 2 *Ves. Sen.* 281, the plaintiff, a seaman, sold his prize money to a physician, at the place where the prize was brought in, and where plaintiff was sick. A bill was filed in chancery to set aside the agreement. A *second agreement* recited the first bill of sale for 150 pounds, and *the bill in chancery* which plaintiff *agreed should be dismissed* with costs, and in consideration of 60 pounds plaintiff *confirms and establishes* the bill of sale, and *renounces all claim* on account of the prize or other demands, and *all suits in law or equity*—both agreements were set aside.

In *Broderick v. Broderick,* 1 *P. Wms* 239, there was a devise to *J.*

2 B

[Hoge v. Hoge.]

*S.* by a will defectively executed (the witnesses not having signed in the presence of the testator). Afterwards the heir, in consideration of 100 guineas, *released to J. S. all his right;* and after that *J. S.*, under pretence that it would facilitate the raising of money to pay debts, procured the heir, for 50 *guineas more*, to *join him in conveyance to J. N.* by lease and release, for 4000 pounds, for which a receipt was given, but money not paid—*J. N.* being merely a trustee for *J. S. The heir was relieved against both deeds.* In *Ardglass* v. *Muschamp,* 1 *Vern.* 237, after the grant of the rent charge, the grantor made a settlement of his estate repugnant to the grant, and *brought his bill to be relieved* against the grant, alleging that it was obtained by fraud. *After which bill the defendant obtained a release* from the plaintiff, the grantor. The grantor died, and then the present plaintiff brought his bill, and was *relieved against both the grant and release.*

In *Wiseman* v. *Broke,* 2 *Vern.* 121, the plaintiff, a man of business and experience, near forty years old, entered into statutes with defendant's testator for payment of ten for one. Afterwards defendant's testator, understanding that chancery relieved against such bargains, preferred his bill against plaintiff, to compel him either to repay the money, with interest, or to be foreclosed of any relief against this bargain, and *plaintiff elected to stand to the bargain,* and said that it was *fairly and duly* made, and that he *would not seek any relief against the same. Notwithstanding all this plaintiff was relieved.*

So in *Butler* v. *Haskell,* there had been repeated confirmations, after an interval of years. See 4 *Desaus.* 714, 715.

In *Baugh* v. *Price,* 1 *Wilson* 320, *Thomas Baugh* on the 21st *of October* 1739, *covenanted* to convey to defendant in fee simple a remainder expectant upon his father's life. Soon after signing the articles, he was desirous of being *off* the bargain, but defendant would not let him; and on the 3*d of November* 1739 he *executed a lease and release.* On the 8th of July 1740 his father died, *whereupon he wrote to Price,* acquainting him with the fact, and telling him *that he shall act in all respects* agreeably to his wishes; *in another letter* he tells *Price* he shall always act justly, and says that *Price* has got a good bargain of him; that he might afford to give him a *back;* but, says he shall not touch one without *Price's* consent. After this, in February 1741, *Thomas Baugh filed his bill in chancery to set aside the articles and conveyance.* To this, the defendant put in his answer, and afterwards *the proceedings were stopped,* and *Thomas Baugh,* in October 1741, *executed a deed reciting the proceedings in chancery, and that the purchase was a fair one,* and thereby *confirms* and *releases* the estate to *Price. Afterwards Thomas Baugh* and *Price,* with the assistance of one Doctor *Thomas,* (to whom *Thomas Baugh* applied) *settled all accounts,* and *Thomas Baugh* seemed so well satisfied, that he thanked Doctor *Thomas* for his kindness. In 1743, *Thomas Baugh's* bill in chancery was dismissed, and in 1746, he died. The plaintiff, his son, soon after preferred this bill, and the *articles* and *both deeds were set aside;* and the barons say, in page 323, that " there was no

[Hoge v. Hoge.]

instance where the original contract was fraudulent, that *any subsequent act would purge it,* and that *by stopping the suit in chancery,* and the *release thereupon given,* the *fraud was double hatched,* and that the transaction *was iniquitous from beginning to end.*" And, I think, the same observations may most justly be made in the case before the court. I shall conclude this point by a quotation from *Hovenden's Supplement to Ves. Jun.* vol. 2, page 164, 165. " The court of equity have very wisely avoided *laying down any general rule* as to the cases in which they will relieve against unfair bargains, lest other means of avoiding the remedies given by the court should be found out. *Lawley* v. *Hooper,* 3 *Atk.* 279. It is proper that the court of chancery *should leave itself unrestricted* on this point, as far as possible, and be *guided by the particular circumstances in each case. Stillman* v. *Ashdown,* 2 *Atk.* 481. For the possibility will always exist, that *human ingenuity* in contriving fraud, will go beyond any cases which have before occurred. *Webb* v. *Rock,* 2 *Scho. & Lefr.* 666."

The sixth exception is not supported in fact, for the court does explicitly answer it in the last clause of the third paragraph from the end of the charge, and also in its answer to the sixth point of defendant; but if the court had altogether omitted to answer it, the defendant could not have been injured thereby, as the law had before been laid down more favourably than defendant had a right to claim.

The charge of the court on the seventh point was at least as favourable to defendant as he was entitled to have it. This is an equitable proceeding, and relief is granted on such terms as in each particular case may appear just. By a recurrence to the cases already cited, it will appear that the impossibility of placing the defendant precisely in his original condition is no objection to the interference of the court, and that the most that is required is that compensation be made. It often happens that valuable improvements are made; but these present no obstacle to the rescinding of the contract, and in such cases, the court merely directs payment for *valuable* and *permanent* improvements, and not for such as are intended to please the taste or fancy.

Before closing, I beg leave to call the attention of the court to one circumstance, which I omitted to notice in examining the first exception. It is this, that here the *trust* is actually confessed by *John Hoge,* the trustee; and the only question is, *who is the cestui que trust?* Although the defendant may plead the statute, yet, if instead of doing so, he confesses the facts charged in the bill, the court will interfere, notwithstanding the statute.

It is known to every man who ever tried a good cause, that the parties often take many things as true without proof. Some facts are so notorious that no one thinks of denying them. They are mentioned by one party, and not contradicted by the other; and parties and court and jury proceed upon the assumption of the truth. Such was the case here; the standing circumstances and relations of

the parties were all known, stated, and not contradicted. So also the relative value of the land in controversy, and the land in Mercer received by plaintiff below. The gross inadequacy is noticed by the court below in its charge.

I make these remarks, in reply to the observations of the counsel of the plaintiff in error, that all the evidence appears on the paper books. I might admit, that all which was said by the witnesses, who were examined, is embraced in the paper books, which I think is not the fact, yet a great deal which was known and assumed by both parties and court, is not there found.

In reply to the cases cited by the plaintiff in error, to show that parol evidence cannot be admitted, I would observe, that they merely prove that you cannot *add* or *contradict* what is written ; such are all his cases. The case of *Lee* v. *Henley*, 1 *Vern.* 37, in which he says, it was held " that no averment of a trust of real estate given by will can be received," contains no such principle. It was an attempt by *Lee* to have inserted in a conveyance to him, a tract or parcel of land which, the scrivener said, was omitted by mistake. It was not a will, but a voluntary conveyance, without consideration, to a nephew.

We do not ask the court to impugn in the slightest degree the will of *William Hoge.* We establish it, and claim under it, but show a matter extrinsic perfectly consistent with it. We do nothing more than this court has lately decided, may be done with a solemn decree of a court of record. In the case of *Berrington* v. *Clark,* decided at the last term, it was held that parol evidence might be received, to show that lands which were decreed by the orphan's court to the eldest son at the valuation, were held by him under that decree, *in trust for all the heirs.* The cases in New York are not applicable here; as that part of the English statute relative to the declaration of trust, which has been omitted in ours, has been adopted in New York. What is said by Justice *Duncan* in *Withers's case,* 14 *Serg. & Rawle* 193, must be taken in reference to the case under consideration. It was not a question between a trustee and a *cestui que trust ;* but an attempt by one brother to claim another brother's share of the proceeds of the real estate of the father, sold under a decree of the orphan's court, in opposition to a judgment creditor of the brother. There was not even an obligation of a sale, but merely a parol agreement, that he should be reimbursed moneys advanced when the land should be sold. The question was, whether that promise should be preferred to a judgment. The case of *Church* v. *Church,* 4 *Yeates* 280, was the case of a voluntary deed which, of course, was good against all but creditors. The evidence therefore sought to be given, that defendant had acknowledged he had given nothing, was irrelevant. It was a contest between two volunteers.

The counsel for the plaintiff in error says " that no disinterested man who was acquainted with *John Hoge* in his life time, would dare to say he was perjured." Now, the whole case turned upon that fact, and was expressly put upon it by the plaintiff below. It

[Hoge v. Hoge.]

was explicitly admitted, that unless the jury believed that *John Hoge* was perjured, the plaintiff could not recover. The jury have therefore said, that he was perjured, and they were disinterested men.

It is also alleged, that although *John Hoge* has confessed a trust, yet his whole confession must be taken together. It is true, we must take it all together, but we are not bound to believe all, a part may be true and all the rest false.

The allegation that the defendants below lost important witnesses by death, is altogether unfounded. They still have all the benefit of *John Hoge's* testimony, and Mr *Campbell* knew nothing, but the compromise; and it is known that witnesses who could have put the whole matter to rest by establishing the trust, and who were intimately acquainted with the entire arrangements and views of the testator and *John Hoge*, were dead before *John Hoge* ever dared to equivocate upon the subject.

The plaintiff in error has insisted upon many things which are matters of consideration for a jury, but with which a court of error has no concern, and which, therefore, I shall not notice, but proceed to the last exception. It must be remembered, that the plaintiff below seeks to recover on the ground of fraud by the defendant, and I might use the words of his honour, the present chief justice, in *Riddle* v. *Murphey*, 7 *Serg. & Rawle* 236 : " he (the defendant) could not claim to be reimbursed in the character of a purchaser, for if the sale was fraudulent, it was a nullity." There the defendant held the legal title, yet a previous tender was held unnecessary. This must be the rule in every case where the defendant is affected with such fraud as will make him a trustee. The case before the court is not like the case refered to in *Snyder* v. *Wolfley*, 8 *Serg. & Rawle* 332, where plaintiff's title is *incomplete* in equity, in which case only the rule is said to require a previous tender. It more nearly resembles the case of *Moody's Lessee* v. *Vandyke*, 4 *Binn.* (31) 43. The defendant's equity, if he has any, can only appear on the trial. It may be that he has received more in the rents and profits than he is entitled to claim; and even in the case of a mortgage, if the rents and profits received by the lender, *up to the time of trial*, are equal to the money lent and interest, the borrower may recover in ejectment, without bringing the amount into court. *Wharf* v. *Howell*, 5 *Binn.* 499. The court is referred to all the cases before cited, where courts have interfered for fraud. In none of them is a previous tender required.

In this case, more than justice is rendered to the defendant by the provision made in the verdict of the jury. He is doubly paid : first by the rents and profits, and then by the verdict of the jury. It is not every fraud that is so well rewarded.

The opinion of the Court was delivered by

GIBSON, C. J.—The sum of the evidence on the part of the plaintiff, in relation to the first of the two essential points in the cause,

[Hoge v. Hoge.]

is contained in the testimony of Mr *M'Giffin*, and the deposition of Mr *Morgan*. The first of these testified, that when he was writing the will, the testator remarked, that " as regards the devise to his brother *John Hoge*, it was a trust, and that he had no other way of doing it : he must leave it entirely to his honour." That no words were used to designate the person for whom the trust was intended ; but that *John Hoge*, the devisee, subsequently told the witness, " that it was intended for young *William Hoge ;*" and that he had " suggested" to the testator to give the estate to him (*John*) as a means of obviating difficulties in securing the benefit of it to young *William ;* that he had been a long time trying to get him to do it, but that he had not had sufficient courage.    Mr *Morgan* deposed to an admission of *John Hoge*, that the devise to him had been in trust for young *William ;* " that this had been done by his (*John's*) advice, or at his instance ; and that he had wanted his brother to do more for him."    Beside these, Mr *Swearingen* testified to admissions of " an understanding between him and his brother, that if young *William* should marry and have a male heir, it would be in his power to do something decent for him."    The first question is, whether this evidence were competent to go to the jury, and, if not disproved, to found a trust for *William*, the plaintiff, who was the testator's natural son.

Contemporary declarations of a testator have always been, not only competent, but powerful evidence of the fact declared ; and the competency of declarations by the devisee, while he was the owner of the land, will not be disputed.    Indeed, the objection was rather to the fact itself, than the evidence of it ; and it is contended that parol evidence of a trust is contrary to our statute of wills, which corresponds, as far as regards the point in dispute, with the British statute of frauds.    Undoubtedly, every part of a will must be in writing ; and a naked parol declaration of trust, in respect of land devised, is void.    The trust insisted on here, however, owes its validity, not to the will or the declaration of the testator, but to the fraud of the devisee.    It belongs to a class in which the trust arises *ex maleficio*, and in which equity turns the fraudulent procurer of the legal title into a trustee, to get at him ; and there is nothing in reason or authority to forbid the raising of such a trust, from the surreptitious procurement of a devise.    In *Dixon* v. *Olmius*, 1 *Cox's Cha. Ca.* 414, a devisee who had been guilty of several acts of fraud and violence, particularly in preventing an attorney, sent for by the testator to alter his will, from entering the bed room, was promptly declared a trustee for the party intended to have been benefited by the alteration.    The question has been, as to the circumstances which constitute such a fraud as will be made the foundation of a decree.    A mere refusal to perform the trust is, undoubtedly, not enough ; else the statute which requires a will of land to be in writing, would be altogether inoperative : and it seems to be requisite that there should appear to have been an agency, active or passive, on the part of the

[Hoge v. Hoge.]

devisee in procuring the devise. In *Whitton* v. *Russell*, 1 *Atk.* 488, it was thought, by high authority, that even a promise to the testator to perform the trust, was not such an agency, because, as it was said, the fraud, if any, consisted not in the procurement of the will, but in the subsequent refusal to perform it ; and that every breach of promise is not a fraud. But it was also thought that the testator had not, in fact, been drawn in to make the will by the promise ; and on no other ground is the decision to be reconciled to a train of authorities by which it is conclusively established, that if he has executed his will on the faith of such a promise, the devisee shall be compelled to make it good. In *Harris* v. *Horwell, Gilb. Eq. Rep.* 11, a testator who had devised all his land to his nephew, desired his heir at law not to disturb him in the possession of certain after purchased lands ; and it was so decreed. So in *Chamberlaine* v. *Chamberlaine*, 2 *Freem.* 34, a testator having settled lands on his son for life, and having discourse about altering his will, for fear there should not be enough beside to pay certain legacies to his daughters, was told by the son that he would pay them, if the assets were deficient ; but afterwards, pretending that the lands devised to him fell short of these legacies, filed his bill to have a sum alleged to be equal to the deficiency, raised out of other parts of the estate ; and it was decreed that, having suffered his father to die in peace on a promise which had prevented him from altering his will, he should pay them himself, the chancellor further remarking, that it was the constant practice of the court to make decrees on such promises. That was a strong case, as the relief claimed would probably have put the son in no better condition than if the alteration had been made. To the same effect is *Devenish* v. *Baines, Prec. in Cha.* 3, in which a copyholder, intending to devise the greater part of his copyhold to his godson, and advising with the copyholders how that might best be done, was prevailed upon by his wife to nominate her to the whole, on her promising to give the godson the part intended for him ; and it was decreed against the wife, notwithstanding the statute of frauds. And in *Oldham* v. *Litchfield*, 2 *Vern.* 506, lands were charged with an annuity, on proof that the testator was prevented from charging them in his will, by a promise of payment by the devisee. There are many other decisions to the same point ; but I shall cite no more than *Thynn* v. *Thynn*, 1 *Vern.* 296, in which a son induced his mother, by promising to be a trustee to her use, to prevail on her husband to make a new will, and appoint him executor in her stead ; and he was so decreed. I have cited these authorities with a particular reference to their circumstances, to show that the difference taken in the argument between real and personal estate, is without foundation. The principle of the relief to be granted, is very satisfactorily disclosed by Lord *Hardwicke*, in *Reech* v. *Kennegal*, 1 *Ves.* 122, where an executor and residuary legatee, who had promised to pay a legacy not in the will, was decreed to discharge it out of the assets ; and I shall close my remarks on this

part of the case with a recapitulation of his introductory observations. The rule of law and of the court, said the chancellor, strengthened by the statute is, that all the legacies must be written in the will; and that all the arguments against breaking in on wills by parol proof were well founded. But notwithstanding that, the court had adhered to the principle that whenever a case is infected with fraud, the court will not suffer the statute to protect it so that any one shall run away with a benefit not intended. That the question was, whether the allegation of fraud were strengthened by the promise of the defendant; and he was of opinion that it was. That it had been taken that the fraud must be on him who might have remedy by law; but the court considered it as a fraud also on the testator. To apply this to the case at bar. If the testator was induced by the promise of his brother, much more if by his suggestion, to believe that a devise to him was the most prudent plan of securing the estate to his illegitimate son, it cannot be said that a breach of confidence thus reposed in him, was intended to be protected by the statute; and with a direction to this effect, the point was put to the jury.

If, then, equity would have decreed the trust against the devisee, it remains to be seen whether the plaintiff has precluded himself from insisting on it against the defendant. The plaintiff had brought his ejectment against a tenant of the devisee, to which the latter had declined to become a party, and while the cause was before arbitrators, had executed a conveyance, the nature of which will presently be stated, to the present defendant, *David Hoge,* and his son *William,* by which he became a witness and testified, it is to be presumed, to the facts contained in his deposition here. This advantage would not have been accorded to him on a bill in equity, for which our ejectment is a substitute, as he would have been made a party. As it was, however, the cause was compromised under the pressure of his testimony, the plaintiff conveying his equity to the defendant, and the latter executing a bond with condition to convey to the former certain lands to be selected by him from a larger body. These were subsequently selected, and a part of them sold by the plaintiff.

By the conveyance of *John,* the devisee, an estate in *tail male* was limited to *William,* the defendant's son, with power to his father, whom I treat as the party really interested, to take the profits during his life, and to " sell and dispose of" the estate, if he should deem it necessary, for the education and advancement in life of his male children. This was a power in gross, or perhaps simply collateral, but being a general one, it gave the *fee simple* to the father, just as if it had been conveyed to him by a deed of bargain and sale, instead, as this was, of a covenant to stand seised; consequently the legal estate being in the defendant, the parties stood, at the time of the compromise, in the relation of *cestuy que trust* and trustee.

The compromise of a doubtful title when procured without such

[Hoge v. Hoge.]

deceit as would vitiate any other contract, concludes the parties, though ignorant of the extent of their rights; and this part of the case depended, therefore, on the plaintiff's ability to bring home to the defendant a knowledge of the falsehood and malpractice imputed to the devisee. The direction presupposed the existence of such practice; and the point was to fix the degree of connivance necessary to make the defendant participant of it. The jury were instructed that if the release were " obtained through the misrepresentation of *John Hoge*, and in consequence of the influence of his testimony and the persuasion of the arbitrators, it is not binding, if *David Hoge* KNEW of such misrepresentations and availed himself *unduly* of such influence and misrepresentations." Who can doubt it? The least advantage taken with a knowledge that it flowed from a corrupt source, would be undue and fatal to the contract. Again: "Should you find that the release was procured by the fraud, falsehood, imposition or influence of *John Hoge*, it is void, *however innocent David Hoge may be*, if the agency or interference of *John Hoge* was *employed* to affect the arrangement. But if *David Hoge* KNEW *of no such misrepresentation*, nor had unfair advantage from such influence and persuasions; if he was not PRIVY to any fraud, falsehood or imposition, even supposing *John Hoge* had perjured himself in the testimony which he gave before the arbitrators, and *David Hoge* had no knowledge or reason to believe it was so, the agreement of compromise will not be avoided." It must be admitted that in attempting to attain to greater precision by repeating the same proposition in different words, the judge has expressed himself not without a shade of obscurity; for it is not easy to determine, without a view of the context, what was meant by innocence which could employ the fraud, falsehood and imposition of another. But in putting the converse of the proposition, it was clearly explained, that by innocence was meant that comparative degree of culpability which consists in abstaining from an interference in the criminal act, but without rejecting a benefit procured by it; for the jury were plainly instructed that if the defendant had neither knowledge of the deceit nor reason to suspect the devisee of playing a foul game for his benefit, the compromise which was the consequence of it would be a binding one. Could he ask for more? Standing as a volunteer, and perhaps the instrument of a corrupt purpose, he ought to appear clearly to have been an unconscious one. He was bound not merely to a scrupulous observance of good faith, but even to vigilance in detecting whatever might give him an unfair advantage. A participation in the benefits of the fraud, having knowledge of its existence, or leaving the means of knowledge unimproved, would undoubtedly implicate him as a confederate, and whether as an active or a passive one, would be immaterial to the question. In this view the point was submitted, and in language which could not on the whole have been misunderstood by the jury.

2 c

[Hoge v. Hoge.]

The remaining points seem to have been immaterial. In regard to this species of trust, the illegitimacy of the beneficiary can never be a circumstance of moment, since equity would undoubtedly declare any one a trustee who would interpose between a testator' and his bounty to a stranger. Neither could the alleged delay in prosecuting, affect the right: certainly it could not, as regards the perpetrator of the fraud or one standing in his place. Beside, it does not appear there was any considerable lapse of time between the discovery of the deception alleged to have been practised in the compromise, and the institution of the suit. Finally, the direction prayed in the defendant's ninth point, was actually given in the very part of the charge to which I have particularly adverted; and in no part of the cause do we perceive any thing which requires it to be sent to another jury.

KENNEDY, J, took no part in the judgment, having been of counsel with the plaintiff in error.

Judgment affirmed.